The People of the State of Illinois ex rel. Edward J. Barrett, Plaintiff, v. Central Republic Trust Company, Defendant.

Mary Barbara Brauer, Appellant, v. Charles H. Albers, Appellee.

Gen. No. 40,327.

Opinion filed May 2, 1939.

CAMPBELL, CLITHERO & FISCHER, of Chicago, for appellant.

WILLIAM J. FLAHERTY, of Chicago, for appellee; JOHN F. CASHEN, JR., and J. RAYMOND McGEEAN, both of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiff, Mary Barbara Brauer, filed her claim in the liquidation proceeding of the Central Republic Trust Company, based on the alleged misconduct of the bank in the sale of securities to her and in administering trusts for the holders of such securities. The master to whom the claim had been referred for hearing recommended that it be disallowed, and the court after overruling claimant's exceptions to the master's report dismissed her claim for want of equity. This appeal is prosecuted to review the order or decree thus entered.

Claimant is the widow of Paul Brauer, who died in 1924, leaving her a considerable estate including an interest in Cafe Brauer, some 228 shares of stock in the Central Republic Trust Company, and various other securities. While alive her husband advised her as to all her investments, and after his death she frequently sought the advice of William G. Sturm, an assistant vice president of the Central Republic Trust Company, to whom her husband had introduced her. For more than 29 years she had been dealing with the bank in the purchase of bonds and mortgages, and maintained there a checking and savings account. Her total investments and reinvestments over this period were in excess of $200,000. The bank never charged her for servicing the bonds and mortgages she purchased. Although claimant's counsel say that she never had any business experience, except clerking in a millinery store prior to her marriage, it is evident that over these many years she purchased and sold securities of considerable value from time to time and had attended to her own financial affairs. After her husband's death she maintained an interest in Cafe Brauer, and although she took no active part in the

management thereof, she received money from profits earned by the cafe.

In August, 1928, Mrs. Brauer purchased mortgages on two separate properties which constitute part of the subject matter of her claim. These purchases are referred to as the Ogren and Katzman mortgages, the first for $15,000 and the second for $16,000. The facts leading to the purchase of these mortgages are substantially the same. She had received circulars describing each of these properties, giving the location, the description of the land and buildings, the type of security and directions for reaching the property, and both circulars contained a statement that the bank's funds had been placed in the mortgages. Before these mortgages were purchased, claimant had told Sturm that she wanted small mortgages. He had none of that kind but told her of the Ogren and Katzman properties, and advised her to go out and look at them. She said she would try to do so but would rely upon him as she did not know much about values. The prospectuses relating to these mortgages fixed the bank appraiser's valuation at $30,000. Claimant's real estate expert testified that the Ogren property was valued at $20,000 in August, 1928, the bank's expert valued the property at $28,500, and Sturm testified that the real estate loan department of the bank valued the property at $30,000, and that he knew the property was worth that much from personal knowledge of real estate values in this particular vicinity. The assessor's valuation on the Ogren property was $9,075. Similar evidence was introduced with reference to the Katzman mortgage. The assessor's valuation on that property was $10,509.

In November, 1930, when the Katzman mortgage matured, Mrs. Brauer arranged for a renewal thereof through Sturm, after conferring with him. The extended mortgage matured in November, 1932. Claim-

ant accepted $3,900 in Home Owners' Loan Corporation bonds and $215 cash for this mortgage in November, 1935. The property was then worth approximately $8,000, and was subject to unpaid taxes and penalties amounting to some $4,400. These taxes were paid out of the proceeds of the H.O.L.C. loan, and her principal loss on this investment of $16,000 was $11,885, for which she sought allowance as a general claim in the liquidation proceeding.

The Ogren mortgage, representing an investment of $15,000, was foreclosed by claimant. She bought in the property at the master's sale, leaving a deficiency of $5,635.51, and received a master's certificate which she tendered back to the receiver of the bank before filing her claim. The tender was refused. The unpaid taxes then amounted to some $4,400, leaving a net value of approximately $4,700. She sought to have the loss on this property amounting to $10,309.46 allowed as a general claim in the liquidation proceeding.

With reference to the purchase of these two mortgages it is contended that claimant reposed special trust and confidence in the bank in connection with the selection of investments and that a fiduciary relation existed between her and the bank; that the bank made false representations as to the material facts to induce claimant to buy these securities and that she did so in reliance upon the good faith and truthfulness of the bank's representations. The master found that no fiduciary relationship existed between the bank and claimant, but only the relationship of vendor and vendee; and that claimant failed to maintain the burden of proving fraud and deceit on the part of the bank as charged by claimant, and that these claims should therefore be dismissed for want of equity.

The question as to when a fiduciary relationship exists has frequently received the attention of courts in this State. In one of the leading cases, *Winkleman v.*

*Winkleman,* 307 Ill. 249, an appeal was prosecuted from a decree declaring a constructive trust in certain real estate conveyed to Laura M. Winkleman by her father, Frederick Winkleman and his wife, Elmira. The Winklemans had three children, two of whom were not living at home with their parents when the deed was executed. Laura was and always had lived with them and continued to do so until after their death. The property conveyed by the deed was valued at $100,000. Laura Winkleman, the grantee, was unmarried, and was employed as a teacher at the Lewis Institute in Chicago, and had always lived with her parents. When the conveyance was made the father was 77 years of age and had for months been sick and feeble in body and mind, and as the bill alleged he was easily susceptible to the influence and persuasions of his daughter, Laura. The evidence disclosed that she had attended to all his business transactions over a period of years, and that he relied on her in business matters and in the management and disposition of his property. The conveyance to Laura by her father and mother was made in reliance upon her promise to dispose of the property after their death—one-third to each of the three children, and a decree was entered upon evidence which the master and chancellor believed constituted a fiduciary relationship between the grantors and grantee. Nevertheless, the Supreme Court after reviewing the circumstances in detail reached the conclusion that the proof was insufficient to justify a decree finding that a fiduciary relationship existed. Although the court found that it was very clear that Laura's father had great devotion for her and trusted her implicitly, and that during his illness she had attended to business matters for him and had access to his safety deposit box, collected checks for rents and deposited the money to her account in the bank, paid the household expenses and did other things of a

similar character, nevertheless it was held that the proof did not show that the father was "subject to the domination and control of his daughter," without which a fiduciary relationship would not exist. *Rubin v. Midlinsky,* 321 Ill. 436; *Duvall v. Chicago Trust Co.,* 284 Ill. App. 647 (Abst.); *Johnson v. Lane,* 369 Ill. 135, and *Byerly v. Byerly,* 363 Ill. 517, are all cases dealing with this subject. The courts have invariably held that a fiduciary relationship exists only when confidence is reposed on one side and there is a resulting superiority and influence on the other side. It is not sufficient that confidence be reposed by one party, but the confidence must be actually accepted by the other party in order to constitute a fiduciary relationship.

Applying these principles of law to the facts relating to the claim on the Ogren and Katzman properties, the record discloses that claimant was a person of intelligence, that she had made purchases from the bank over a long period of years and had attended to her own affairs; that although she sought and received Sturm's advice from time to time there is no evidence to indicate that he exercised a resulting superiority or dominating influence on her, but merely conferred with her and tendered his advice and recommendations as to the purchase of securities as in the ordinary case of vendor and vendee.

The descriptive circulars claimant had before she made these purchases set forth the address of the properties, the width and depth of the lots, type of improvement on each, directions as to how to reach the properties, and in each instance Sturm advised her to go out and examine the property. Although there is a conflict in the evidence as to the fair appraised values of these properties at the time of the purchase of the mortgages, Sturm testified that they were fairly worth $30,000, and real estate experts testifying pro and con valued them at between $20,000 and $28,000. There

was nothing to preclude claimant from making an independent investigation, and after a careful examination of the evidence we have reached the conclusion that the court properly overruled plaintiff's exceptions as to these two items of her claim and approved the master's conclusions that no fiduciary relationship existed between claimant and the bank, and that claimant failed in maintaining the burden of proving her allegations of fraud and deceit on the part of the bank.

The balance of Mrs. Brauer's claim presents a different situation, however. In September, 1930, she held funds in reserve to pay a possible liability. The bank sent her a letter signed by Mr. Sturm as its assistant vice president suggesting that she consider investing this money in a "gilt edge investment loan for about eleven months and paying you 6% interest," offered by the bank. On receipt of this letter claimant had a talk with Sturm who told her about the 1106 Lake Shore Drive Building Corporation bonds, which he characterized "as good as gold." He told her that there were five very wealthy men back of them and gave her a circular containing descriptive information about the bonds. On the bank's recommendation she purchased $10,000 of these bonds at par plus accrued interest. These bonds were part of a $450,000 issue the bank had underwritten and issued September 3, 1929. As to this claim claimant likewise contends there were representations of fact with reference to the value of the property, the wealth of the five individuals who had guaranteed the bonds, the uses to which the building could be put, the margin of security and other circumstances claimant's counsel say were all material, but untrue. As to these bonds claimant seeks a preferred claim in the liquidation proceeding against the securities deposited with the State auditor to secure trust creditors.

Aside from the contention that these bonds were purchased pursuant to misrepresentations made by the bank, it is also urged that the bank as trustee for the benefit of claimant as holder of bonds was guilty of such breaches of trust as to justify the allowance of her claim. The salient facts relating to this phase of the controversy may be summarized briefly as follows: These bonds were secured by trust deed conveying real estate to the bank as trustee, and it is admitted that the bank was trustee of express trusts for the benefit of claimant and others holding bonds in the 1106 Lake Shore Drive Building Corporation. The bank continued to act as such trustee until September 26, 1933, and as trustee it was the obligee of the written guarantee agreement entered into by the five individuals interested in the property. The bank in its individual capacity owned many of these bonds. They became due September 3, 1931. The 1929 taxes on the property amounted to $11,792.76. $40 was paid on account of these taxes May 19, 1931. The balance had become delinquent May 15, 1931. (Ill. Rev. Stat. 1937, ch. 120, par. 165, sec. 177, p. 2648 [Jones Ill. Stats. Ann. 119.200].) The balance of the 1929 taxes and taxes for every subsequent year were unpaid and no deposit was made with the bank as trustee to secure the unpaid taxes. Shortly before the bonds matured claimant received a letter from the bank dated August 29, 1931, advising her that the bond issue of $450,000 would mature on September 3, 1931; that payment of $150,000 on account of principal, together with interest due September 3, would be deposited with the bank before the latter date providing arrangements could be made for the extension of $300,000 of the bonds for three years, interest at 6 per cent, the payment of principal and interest on the extension to be guaranteed by the same parties that were guarantors in the original loan. The

letter gave the description of the property, the use to which it was put, and stated that it had been acquired two years previously for a cash consideration of $720,000, and concluded by stating that "because of the excellent record of this bond issue, and the fact that $150,000 is to be paid on account of the principal at this time, we can thoroughly recommend that our holders retain their bonds for the extended term. We suggest that you forward your bonds to us immediately, using the enclosed transmittal blank for that purpose, and we will promptly send you a receipt for the same, . . . ." This letter was signed by Mr. Sturm as vice president. On receipt of the letter claimant proceeded to the bank where she had a conversation with Sturm which is disclosed by her undisputed testimony as follows: "I asked Mr. Sturm to see to it that my bonds were paid at that time, and he said that they could not pay it. On or about August 29, 1931, I asked Mr. Sturm if the $10,000 would be paid for the bonds, but it didn't do me any good. He said that two of the men had lost all their money and three of them were holding back. I said, 'If that is the thing to do, to renew it, all right.' He said that three of the men were very reliable, but that two of them had lost all of their money. I consented to the extension of the bonds and received interest for a short time. Then they defaulted again. I was never told during the conversations at about the time these bonds were extended, that $150,000 of the bonds had been paid, nor that taxes were in default." At the time of this conversation the bank owned $28,500 in principal amount of these bonds and $40,500 of them stood in the name of Eugene V. R. Thayer, who had shortly prior thereto been executive vice president and was still a director of the bank. Sturm did not tell Mrs. Brauer that the bank and its officer, Thayer, owned bonds of this issue

which they had no intention of extending. Accordingly, claimant signed a consent to the extension dated December 5, 1931. Five days later the bank received a payment of $173,342.54 as trustee for this bond issue. Out of these funds the bank paid itself $15,000 principal on bonds which it held, and paid $40,500 bonds outstanding in the name of Thayer in full. The bank also paid itself a commission of $9,000 for its services in extending the maturity of the bonds held by claimant and others. In September, 1932, four of the guarantors paid 55 per cent of the current interest. The balance was never paid. The bank in its capacity as trustee sued the fifth guarantor for $4,134 representing his pro rata share of this interest instalment. It never brought the suit to trial and this was the only action the bank ever took to collect the bonds or interest thereon. When claimant's counsel discovered these facts they tendered the bonds in the sum of $10,000 to the receiver. Their fair value according to the stipulation of the parties was then $4,500. Claimant's loss was therefore $5,500.

Two principal legal propositions are advanced with reference to the facts hereinbefore set forth: (1) It is urged that the trustee of choses in action is obligated to use reasonable diligence to promptly collect all funds owing thereon, and in the event that he does not proceed promptly the burden is upon the trustee to prove that collection was impossible, and in the absence of such proof the trustee will be charged with the total loss sustained; and (2) the bank's action in using funds which it received in its capacity as trustee to pay bonds owned by the bank and its officer, to the exclusion of the claimant and other bondholders, was a breach of trust to the extent of the funds retained by the bank and its officers.

With reference to the first contention it is evident that the building corporation defaulted in payment of 1929 taxes in excess of $11,750, which became delinquent in May, 1931. No deposit to secure their payment was made with the trustee, as required by the trust deed, in the event that the mortgagors, "in good faith," should contest the taxes. The deposit of $40 certainly did not represent a fair tax liability on property the bank had represented as being worth $720,000, and it cannot fairly be argued that the deposit of that sum complied with the good faith provision of the trust deed. In 1932 only 55 per cent of the September interest instalment was paid and the bank sued one of the guarantors for the balance, but took no steps to bring the suit to trial. Afterward a full instalment of interest was defaulted in March, 1933, but again the bank took no legal action to collect it, nor to collect the principal or interest after succeeding defaults. After 1931, when the first tax default occurred, the real estate continued to decline in value and it was incumbent upon the trustee to take some reasonable steps to enforce the collection of these various items as provided in the trust deed. Nevertheless, substantially no steps were taken by the bank, and under the circumstances we think the trustee failed to use the reasonable diligence which the law imposed upon it. (*Dern v. Kellogg,* 54 Neb. 560; *Omaha National Bank v. Kiper,* 60 Neb. 33; *In re Reinboth* (C. C. A. 2d), 157 Fed. 672; *Waterman v. Alden,* 144 Ill. 90.)

As to the contention that the bank as trustee was guilty of fraud in using funds it received in its trust capacity to pay bonds owned by the bank and its officers to the exclusion of claimant and other bondholders, the evidence is clear that claimant, after advising Sturm that she wanted her bonds paid rather than extended, was met with evasions which led her to

believe that there was no possibility of collecting her bonds, as a result of which she consented to the extension. She was not told at the time that the bank and one of its officers held bonds on which they expected to receive payment. These statements were made to her by an officer of the trustee under a trust deed which specifically provided that "all moneys so deposited shall be held by the trustees as a special fund in trust for the payment of such bonds and coupons . . .," and under these circumstances it would be a departure from the fundamental law of trusts, which requires a trustee to disclose fully and fairly to the beneficiary all the facts upon which the beneficiary is required to exercise judgment, and which impose a most rigid duty on the trustee to deal fairly with the beneficiary in matters relating to the trust. Numerous cases are cited by claimant to support this requirement of the law, the earliest of which is *Thorp v. McCullum*, 6 Ill. 614, wherein the fundamental duty of the trustee is defined as follows (p. 626) : "Indeed it is too sound a rule of policy, although arbitrary and inflexible, and too well supported by reasons deduced from observation and experience, to yield to particular cases of hardship. The temptation of self interest is too powerful and insinuating to be trusted. Man cannot serve two masters; he will foresake the one and cleave to. the other. Between two conflicting interests, it is easy to foresee, and all experience has shown, whose interests will be neglected and sacrificed. The temptation to neglect the interest of those thus confided must be removed by taking away the right to hold, however fair the purchase, or full the consideration paid; for it would be impossible, in many cases, to ferret out the secret knowledge of facts and advantages of the purchaser, known to the trustee or others acting in the like character. The best and only safe antidote is in the

extraction of the sting; by denying the right to hold, the temptation and power to do wrong is destroyed."

One of the fundamental principles of the law of trusts is that a trustee will not be permitted to retain any personal advantage received through dealings with the trust property (*Bennett v. Weber,* 323 Ill. 283, 293, 294; *Joliet Trust & Savings Bank v. Ingalls,* 276 Ill. App. 445, 451) and where a trustee has come into a position where his interests as an individual conflict with the best interests of the trust, and the trust sustains a loss from transactions growing out of such conflicting interests the trustee will be required to reimburse the trust. The courts have said that this requirement is dictated by considerations of public policy and is not governed by the facts of any particular case. This principle of law is applied to all cases where a trustee permits his individual or personal interest to influence his conduct as trustee. (*People v. Canton Nat. Bank,* 288 Ill. App. 418; *Mehaffy v. Roscoe Farmers' Savings Bank,* 210 Ia. 116.) And the trustee's duty not to place himself in a position where his personal interests conflict with those of his beneficiary, likewise applies to the officers of corporate trustees. (Bogert' on Trusts and Trustees, 1935, vol. 3, sec. 543.)

The remaining contentions apply to the commission of $9,000 received by the trustee for extending the bonds held by claimant and others. In *White v. Sherman,* 168 Ill. 589, a trustee received commissions in connection with insurance written for the trust, and the court required him to refund these commissions to the beneficiary, saying (p. 611): "The fact, that he was receiving commissions, might have subjected him to a temptation to place a larger line of insurance than was necessary on the trust property. It is not essential, that the estate has suffered a loss from what he has done; it is sufficient that he has gained a profit."

In the case at bar the bank received a commission for extending bonds by reason of which it was able to receive payment on bonds owned by itself and its officer, and this no doubt caused the bank to induce claimant and other bondholders to extend their bonds so as to make possible the payment of $150,000 in the event that the extension of $300,000 in bonds could be obtained by the trustee. No doubt the bank yielded to this temptation and recommended the extension by claimant and others, ''because of the excellent record of this bond issue,'' at a time when a serious default had already occurred in payment of taxes. We are therefore impelled to hold that it would be inequitable to permit the bank to retain the $9,000 commission thus obtained.

Lastly, it is urged by claimant that the court erred in taxing $625 master's fees against her. It is argued that because this was merely one of many claims in liquidation, the costs should have been charged against the receivership as an expense of liquidation. Claimant says that it was the receiver rather than the claimant that was responsible for the fact that the hearing of this claim took more time than it should have taken. We are not disposed to pass upon that fact, and since Mrs. Brauer's claim is allowed in part and disallowed in part, we think it would be proper for her to share in the expense incurred. Therefore the master's costs and expenses, including his statutory fees, are apportioned equally between the receiver and claimant.

It is therefore ordered that the decree of the circuit court be affirmed as to the dismissal of Mrs. Brauer's claim relative to the Ogren and Katzman mortgages, reversed as to her claim relative to the 1106 Lake Shore Drive Building Corporation bonds and also reversed as to the question of costs, and the cause is remanded with directions to enter a decree in her favor in con-

formance with the views herein expressed, and to tax the master's costs and expenses, including his statutory fees, one-half against appellant and one-half against appellee.

*Decree affirmed in part and reversed in part and cause remanded in part with directions.*

SCANLAN, P. J., and JOHN J. SULLIVAN, J., concur.