**EVRA CORPORATION, formerly known as Hyman-Michaels Company, Plaintiff,**

v.

**SWISS BANK CORPORATION, a Swiss corporation, Defendant and Third-Party Plaintiff,**

v.

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association, Third-Party Defendant.**

No. 73 C 2643.

United States District Court, N. D. Illinois, E. D.

May 12, 1981.

Joel J. Sprayregen, Aaron, Schimberg, Hess, Rusnak, Deutsch & Gilbert, Chicago, Ill., for Evra.

Alan N. Salpeter, Mayer, Brown & Platt, Chicago, Ill., for Continental.

John Conlon, Hopkins & Sutter, Chicago, Ill., for Swiss Bank.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROSZKOWSKI, District Judge.

This matter comes before the court for a ruling following a bench trial beginning on August 18, 1980 and ending on August 28, 1980.

Plaintiff, EVRA Corporation, formerly known as Hyman-Michaels Company ("Hyman-Michaels"), brought this civil action against Swiss Bank Corporation ("Swiss Bank") for its failure to promptly make payment of an installment of ship charter hire in accordance with a telex request sent by Continental Illinois National Bank and Trust Company of Chicago ("Continental"). Hyman-Michaels' complaint alleges breach of contract, negligence and breach of fiduciary duty.

Swiss Bank, pursuant to Rule 14(a) of the Federal Rules of Civil Procedure ("F.R.Civ. P."), joined Continental as a third-party defendant on the grounds that Continental is or may be liable to Swiss Bank for all or part of plaintiff's claim against it. Continental in turn filed a counterclaim against Hyman-Michaels, seeking recovery from

Hyman-Michaels for all or part of the damages for which Continental might be found liable to Swiss Bank.

Hyman-Michaels, pursuant to Rules 13(a) and 14, F.R.Civ.P., filed a counterclaim against Continental for its alleged wrongdoing in connection with the transaction in question.[1] Hyman-Michaels seeks recovery from Continental under theories of negligence, breach of contract, and breach of fiduciary duty.

Jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1332.

After a thorough examination of the entire record of this action, the court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT[2]

In 1973, Hyman-Michaels was an Illinois corporation with its principal place of business at Chicago, Illinois. It was engaged in the international and domestic purchase and sale of scrap metals and oceanic freighter shipping.

In 1976, Hyman-Michaels sold its scrap metal business to Azcon Corporation and at the same time changed its name to EVRA Corporation.

Swiss Bank is a Swiss corporation with its principal office in Basle, Switzerland. It is a major international bank with offices throughout the world.

Continental is a national banking association with its principal place of business located in Chicago, Illinois. Continental is also a major international bank with offices throughout the world.

In April, 1972, Hyman-Michaels entered into a written contract to sell and deliver a quantity of steel scrap to a Brazilian corporation over a period of two years. The contract provided that the purchaser could decline to purchase scrap if its price exceeded a certain amount. Hyman-Michaels entered into a joint venture agreement with the Schiavone-Bonomo Corporation for the performance of the Brazilian contract under which Schiavone-Bonomo was to provide a portion of the steel scrap and Hyman-Michaels was to provide the ships to transport the scrap.

In June, 1972, Hyman-Michaels entered into a standard form time charter ("Charter") with the Pandora Shipping Company for a ship known as the "Pandora" intending, among other things, to use it in delivering the scrap metal under the Brazilian contract. The Charter was for one year, with two successive six-month options exercisable by Hyman-Michaels.

The Charter rate for the vessel for the first twelve months was $1,825 a day, to be paid semi-monthly "in advance" to the account of Pandora Shipping Company at Banque de Paris et des Pays-Bas (Suisse) SA, Geneva, Switzerland ("Banque de Paris"). The daily Charter rates for the successive six-month option periods were $1,925 for the first six-month period and $2,050 for the second. The Charter provided that if Hyman-Michaels failed to pay the hire in advance, the owner was at liberty to withdraw the vessel from Hyman-Michaels' service.

The Pandora was delivered to Hyman-Michaels' service on July 27, 1972 at 2100 hours.

Hyman-Michaels made the payments of the first through fifth and eighth through eighteenth installments of the Charter hire by wire transfers. Each of the wire transfers was made through Continental. Continental used Swiss Bank as its correspondent bank for the wire transfers of the first, fourth, fifth and eighth through eighteenth installment payments. All of these wire transfers were sent to and received by Swiss Bank's telex machine 22235.

---

1. On August 13, 1980, this court denied Continental's motion to dismiss the counterclaim filed by Hyman-Michaels, 496 F.Supp. 663. On August 18, 1980, Continental moved to have its counterclaim treated as an affirmative defense. This motion is pending before the court.

2. Any finding of fact which may be more properly termed a conclusion of law shall be deemed a conclusion of law.

In each instance when a Charter installment payment was made through Continental, Hyman-Michaels received after requesting such payment a document from Continental entitled "Receipt Non-Negotiable" (hereinafter referred to as Continental's "advice form").

At the time Hyman-Michaels entered into the Charter, charter rates were at the bottom of the market. By October, 1972, however, charter rates had gone up dramatically. The sharp uptrend continued throughout the remaining period of the Charter and the Charter option periods.

Hyman-Michaels made the payments of the sixth and seventh installments of the Charter hire by checks sent in the mail. On October 30, 1972, the owner of the Pandora notified Hyman-Michaels that it was withdrawing the Pandora from the Charter because the seventh installment payment, due on October 26, had not been received by Banque de Paris. This attempted withdrawal of the Pandora was submitted to a panel of three arbitrators in accordance with the Charter. On December 5, 1972, the panel ruled that the owner of the Pandora could not withdraw her from the Charter, but put Hyman-Michaels on notice that the payment provision of the Charter would be strictly enforced thereafter.

Subsequent to the arbitration proceeding, Hyman-Michaels reverted to the use of wire transfers exclusively for the payment of the Charter installments. Beginning with the eighth installment payment, the procedure followed by Hyman-Michaels was to have its accounting department make a request to Continental to effect a wire transfer a few days before each Charter hire payment was due.

By March, 1973, the price of steel scrap under Hyman-Michaels' contract with the Brazilian corporation rose to such a level that the Brazilian corporation elected not to purchase any more scrap. Hyman-Michaels thus had the opportunity to subcharter the vessel on the open spot market. Hyman-Michaels entered into a subcharter for the Pandora under which it was to be loaded with grain at Baton Rouge, Louisiana on April 28, 1973 for delivery to Poland.

At or about 9:17 A.M. on April 25, 1973, Carlos Oliveros, an employee of Hyman-Michaels, telephoned Continental and requested that Continental make a wire transfer in the amount of $27,040.62 to the account of the Pandora's owner at Banque de Paris for the Charter hire period of April 27—May 11, 1973. Payment of this installment was due at or before 2100 hours (9 P.M.) Geneva time on April 27, 1973.

The requested telex message was prepared by Continental in Chicago. It was then forwarded at 4:36 P.M. (Chicago time) by telex to Continental's London Branch for retransmittal to Swiss Bank in Geneva. The telex message requested that retransmission be addressed to Swiss Bank's telex machine 22235.

Continental issued its standard Continental advice form to Hyman-Michaels for the wire transfer and Hyman-Michaels received it at or before 8:30 A.M. of April 27, 1973. This advice form confirmed to Hyman-Michaels that its account had been debited for $27,040.62 and that Continental was proceeding to execute the wire transfer.

Beginning at about 9 A.M. (London time) on April 26, 1973, Brian Brown, a telex operator employed by Continental's London Branch, tried to retransmit the April 25 telex instruction to Swiss Bank's general telex number 22235. After trying unsuccessfully for almost an hour to reach the general number, Brown diverted the telex message to Swiss Bank's telex machine 22226, a number he had used in the past, which was located in Swiss Bank's Foreign Exchange Department.

In retransmitting the April 25 message from Continental's London Branch to Swiss Bank's machine 22226,[3] Brown received Swiss Bank's "answer-back" at the beginning and at the end of the message. In

<hr>

3. Although Brown dialed telex number 22226, the message was automatically routed to machine 22226B, one of several machines available to receive a message when telex number 22226 is reached.

between the two "answer-backs", Brown had a clear copy of the message on his telex machine in London. Accordingly, the court finds that on April 26, 1973, at approximately 9:52 A.M. Geneva time, Swiss Bank received the retransmission of the April 25 message on its telex machine 22226B.

Prior to April 27, 1973, Continental's London Branch had diverted several cables from the general telex machines at Swiss Bank to those in Swiss Bank's Foreign Exchange Department. In 1973, the Foreign Exchange Department was located on the same floor as, and next door to the Cable Department, in which telex machine 22235 was located. Swiss Bank never complained to Continental's London Branch about diversion to telex machine 22226 in the Foreign Exchange Department and never notified Continental not to use it.

Swiss Bank's foreign exchange room telex machines would receive an average of three to four telexes per week destined for other departments of the bank. Swiss Bank had no procedure for logging these telexes or insuring that they were promptly acted upon.

In April, 1973, Swiss Bank's telex machine 22226B was not equipped to make copies of telex messages which it received. In addition, it did not automatically shut off when it ran out of paper, but continued to receive messages which were not recorded in any manner.

Swiss Bank had no systematic method of checking the telex machines in the foreign exchange room to see if they had paper. The machines were operated by junior foreign exchange dealers who were not professional telex operators.

Swiss Bank took no action whatsoever in response to the April 26, 1973 telex from Continental's London Branch. The court finds that Swiss Bank either (a) lost the April 25, 1973 telex message, or (b) failed to have paper in its machine 22226B at the time that the message was being received, in which case no actual copy of the message would have been produced.

At about 8:30 A.M. (Chicago time) on Friday, April 27, 1973, Hyman-Michaels received a telex message from the owner of the Pandora stating that the owner had withdrawn the vessel from service under the Charter because the nineteenth installment had not been paid to its account at Banque de Paris.

Between 8:45 A.M. and 9 A.M., Albert Moeng of Hyman-Michaels contacted Richard Beutel of Continental, advising him of the owner's claimed non-receipt. Hyman-Michaels instructed Continental to instruct its correspondent, Swiss Bank, to persist in attempting to effect the payment even in the face of a rejection by the owner's bank.

Hyman-Michaels telephoned the owner's representative on the morning of April 27, 1973 and told him that payment had been made. The owner persisted in his decision to withdraw and notified Hyman-Michaels that all further attempts to effect payment would be rejected.

Hyman-Michaels' admiralty counsel at Hill, Betts & Nash of New York City were informed of the situation early on April 27. They contacted the owner's attorneys and, through negotiations with them, reached an agreement that day for the submission of the dispute concerning the withdrawal of the Pandora to arbitration.

After his telephone conversation with Moeng of Hyman-Michaels, Beutel of Continental contacted Tom Jarom, who handled customer assistance matters in the International Banking Department of the Continental Bank (Chicago). Beutel informed Jarom of the details of the transaction and instructed him to find out what had happened to the payment of the nineteenth installment.

Jarom first located the underlying documentation for the payment instruction. He reported to Beutel that he had confirmed that on April 25, 1973, Continental had debited Hyman-Michaels' account for $27,040.62, had credited Swiss Bank's account for the same amount, and had sent a payment instruction to its London Branch for retransmission to Swiss Bank (Geneva).

Thereafter, between 10:30 A.M. and 11:00 A.M. (Chicago time), Jarom contacted Swiss Bank by telephone. He inquired as to receipt of the telex and was advised that Swiss Bank had no record of its receipt. Jarom asked if he could carry out the transfer by giving Swiss Bank the tested telex code and payment instructions over the telephone, but the Swiss Bank employee told Jarom it was too late (it being approximately 6:00 P.M. in Geneva at that time).

Jarom reported the results of his investigation to Beutel and Beutel, in turn, reported what he had learned to Moeng.

No further action was taken by any of the parties on Saturday, April 28 or Sunday, April 29, 1973. On Monday, April 30, 1973, at about 10:00 A.M. (Chicago time), Beutel telephoned Continental's Geneva representative, Larry Gibb. Beutel told Gibb the details of the April 25 wire transfer and instructed Gibb to try and find out what had happened to it.

On May 1, 1973, Gibb contacted Alain Roux, the head of Swiss Bank's foreign relations and cables departments, and asked him to trace the message. Roux conducted a search of the cables department and found no evidence of receipt.

Later in the day on May 1, Gibb recontacted Roux and advised him that Continental's London Branch had diverted the telex to Swiss Bank telex 22226B. Upon learning that the telex had been sent to 22226B, Roux directed Pierre Andre Adler, head of Swiss Bank's foreign exchange department, to search his department's records for evidence of the telex. Adler made two searches of his department's files, including a separate file for all garbled messages; but found no trace of the April 25 telex message.

On May 1, 1973, Roux suggested to Continental that it re-transmit the telex to 22235, which Continental did during the afternoon of that day. Swiss Bank re-transmitted the May 1, 1973 telex to Banque de Paris on May 2, 1973.

On May 8 and 14, 1973, arbitration hearings were held in New York City. On May 21, 1973, the arbitrators held that the owner was entitled to withdraw the Pandora from the Charter. With respect to the root cause of the withdrawal, the arbitrators stated as follows:

> However, the Panel is unanimously of the opinion that the root cause of this situation did not lie with Charterers, as very definite proof was shown to the Panel that payment was properly made by Charterers in sufficient time on April 25th A.M., through their Bank, Continental Illinois Bank of Chicago; further that this Bank acting properly and expeditiously in accordance with established proven practice, instructed their correspondent Bank (Swiss Bank Corporation) in Geneva, Switzerland, by telex in due time to make the said payment to Owners' bank in Geneva, but that Swiss Bank Corporation, having acknowledged the message by teletype (answerback automatically received by Continental Illinois Bank) thereupon lost the said instructions and failed to make payment when due on April 26th or April 27th. Charterers were only made aware of this matter upon receipt of a message from Owners on April 27th at 8:30 A.M. Chicago time, that vessel was being withdrawn for nonpayment of the 19th hire installment. Up to this point, the Panel regards Charterers as blameless and having properly executed their Charter Party commitments and obligations in this matter. (Bank error being beyond their control).

On July 5, 1973, the arbitrators' decision was confirmed by the United States District Court for the Southern District of New York.

### CONCLUSIONS OF LAW[4]

This court has jurisdiction over this action under 28 U.S.C. § 1332.

The first question to be considered is whether Illinois law or Swiss law governs the determination of the issues in this case.

---

**4.** Any conclusion of law which may be more properly termed a finding of fact shall be deemed a finding of fact.

■ In a diversity action, the choice of law rules of the state in which the district court is located apply. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In Illinois, it is well established that the courts will look to the jurisdiction with the "most significant relationship" in determining the applicable law in tort cases. *Ingersoll v. Klein*, 46 Ill.2d 42, 45, 262 N.E.2d 593, 595 (1970); *Forty-Eight Insulations, Inc. v. Johns-Manville Products Corp.*, 472 F.Supp. 385, 391 (N.D.Ill.1979). Increasingly, Illinois courts have employed the "most significant relationship" approach in contract cases as well. *Ehrman v. Cook Electric Company*, 468 F.Supp. 98 (N.D.Ill.1979).

■ In determining which jurisdiction has the most significant relationship to a tort action, the court should consider: (1) the place of injury; (2) the place where the conduct causing injury occurred; (3) the domicile, place of incorporation, and place of business of the parties; and (4) the center of gravity of the parties' relationship. "[T]he contacts test is not an end in itself to be applied mechanically, but rather is a means reliably calculated to insure that the interests of the state with the most significant relationship to the occurrences will be protected." *Forty-Eight Insulations, supra,* at 391.

Plaintiff claims that Illinois law governs this entire action. Defendant Swiss Bank argues that some issues should be determined under Illinois law while others are more appropriately decided under Swiss law. Specifically, defendant claims that any liability it may have to plaintiff should be determined under Swiss law because Switzerland is the site of the alleged tort, defendant is located in Switzerland, and any relationship between defendant and plaintiff was created in Switzerland.

■ In applying the "most significant relationship" test to the instant case, the court finds that Illinois law should govern all aspects of this action. Although Switzerland is the place where the conduct causing the injury occurred and is the defendant's place of business, all other elements point to Illinois. Both Hyman-Michaels and Continental are Illinois residents and conduct business in Illinois. The acts which resulted in Hyman-Michaels' loss were set in motion in Illinois. Illinois, as Hyman-Michaels' place of domicile, is the place where the alleged injury to plaintiff can be said to have occurred.

Finally, the center of gravity of the relationship between the parties is unquestionably Illinois. Hyman-Michaels, headquartered in Illinois, hired Continental in Illinois to make the transfer of funds necessary to effect the Charter payment. Because the payment had to be made in Switzerland, Continental used defendant Swiss Bank as its correspondent bank to transfer the funds by wire.

Illinois, as the place of incorporation and principal place of business of plaintiff, the principal place of business of third-party defendant Continental, and the center of the relationship of the parties, has the most significant relationship to this action with respect to all claims between the parties and with respect to the measure of any damages.

Plaintiff's complaint alleges breach of contract, negligence, and breach of fiduciary duty on the part of defendant Swiss Bank. Defendant claims that it owed no duty of care to plaintiff under either Swiss contract or tort law. Swiss law requires privity and thus precludes the imposition of liability to the owner on a correspondent bank.

■ As discussed below, Illinois law does not require privity to establish the existence of a duty. It is undisputed, however, that a contract existed between plaintiff and Continental. Continental owed plaintiff a duty of care and Swiss Bank, as Continental's correspondent bank, owed plaintiff that same duty.

Although the Uniform Commercial Code ("U.C.C.") does not specifically address the problems of electronic fund transfers, courts have reasoned by analogy from concepts contained therein. In *Delbrueck & Co. v. Manufacturers Hanover Trust Com-*

*pany*, 609 F.2d 1047 (2d Cir. 1979), the court held that transfers of funds made via an electronic fund transfer system known as CHIPS (Clearing House Interbank Payments System) were irrevocable when made. The court found that the U.C.C. was not applicable to the case but stated that "analogous use of concepts such as the finality of checks once 'accepted' (§§ 3–410, 4–303) would support the irrevocability of these transfers." 609 F.2d at 1051.

An analogy may be drawn between the concept of "collecting bank" as found in Article 4 of the U.C.C. and Swiss Bank's role as a correspondent bank in the instant case. Under Section 4–201, a collecting bank's agency status with respect to the owner of an item is presumed prior to final settlement of the item.[5] Similarly, a correspondent bank in a wire transfer transaction may be presumed to be an agent of the initiator of the transaction until such time as the transaction is completed. The court finds that Swiss Bank, as a correspondent bank in the subject transaction, was an agent of plaintiff and owed plaintiff the same duty of care as did Continental with whom plaintiff had an express contractual relationship.

■ We turn now to plaintiff's negligence claim. Under Illinois law, a plaintiff in a negligence action must prove the existence of a duty owed by defendant to plaintiff, a breach of that duty, and an injury proximately resulting from the breach. The existence of such a duty is a question of law. *Cunis v. Brennan*, 56 Ill.2d 372, 308 N.E.2d 617 (1974).

■ In determining whether a legal duty exists, the court must find that the occurrence involved was not simply foreseeable but that it was reasonably foreseeable. As stated by the Court in *Cunis*:

. . . The creation of a legal duty requires more than a mere possibility of occur-

rence. Negligence as defined in the Restatement (Second) of Torts (1965), section 282, is conduct which falls below the standard established for the protection of others "against unreasonable risk of harm." Harper and James, in their Law of Torts, observe: "Not what actually happened, but what the reasonably prudent person would then have foreseen as likely to happen, is the key to the question of reasonableness." (2 Law of Torts (1956), sec. 16.9, at 929).

308 N.E.2d at 619.

Other factors to be considered in determining whether a duty exists include "the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant. . . ." *Cross v. Chicago Housing Authority*, 74 Ill.App.3d 921, 925, 30 Ill.Dec. 544, 547, 393 N.E.2d 580, 583 (1st Dist. 1979).

■ Plaintiff claims that Swiss Bank owed plaintiff a duty to transmit the wire transfer payment accurately and in a timely manner and that Swiss Bank breached that duty. Plaintiff contends that Swiss Bank negligently and carelessly failed to transmit the wire transfer payment in a timely manner after indicating that the telex message to transfer had been received on April 26, 1973.

Defendant argues that the injury suffered by plaintiff was not "reasonably foreseeable" because the telex machine employed by Continental to transmit the message in question is ordinarily used for foreign exchange transactions. Foreign exchange transactions require an interchange of information between Swiss Bank and the other party to the transaction. If a machine is out of paper, this interchange does not occur and there can be no damage to the customer. Defendant contends that, despite the fact that messages unrelated to

---

**5.** U.C.C. § 4–201(1) provides in pertinent part:
Unless a contrary intent clearly appears and prior to the time that a settlement given by a collecting bank for an item is or becomes final . . . the bank is an agent or subagent of the owner of the item. . . .

A collecting bank is "any bank handling the item for collection except the payor bank." U.C.C. § 4–105(d).

foreign exchange transactions are received regularly on the foreign exchange machines, the unique facts of the subject occurrence were not foreseeable.

The court finds that defendant Swiss Bank owed a duty of care to plaintiff to maintain a system of receiving and disposing of telex messages upon which plaintiff could rely, and that Swiss Bank breached that duty. The first evidence of Swiss Bank's negligent procedures is the automatic answer back code on the telex machine in question, which continues to confirm the receipt of messages regardless of whether the content of the message is being recorded. The fact that the machine is used primarily for foreign exchange transactions does not excuse defendant's negligent failure to monitor the paper supply of the machine.

Swiss Bank was also negligent in failing to institute a system for logging messages to insure that diverted messages (messages intended for other departments) were not lost or mishandled. Testimony by the head of Swiss Bank's foreign exchange department, Pierre Andre Adler, established that Swiss Bank failed to equip the machines in the foreign exchange department to produce carbon copies of incoming messages and also failed to adopt any system for registering diverted messages which would insure that they were sent to the correct department and properly acted upon. Such a cavalier attitude toward major transactions by a sophisticated international bank is shocking to the court.

The court rejects defendant's argument that three or four diverted messages per week is not sufficient notice of the potential risk involved to its non-foreign exchange customers. The evidence has shown that diverted messages may involve large sums of money and that, if such a message is lost or not acted upon promptly, the damages suffered by the initiator may be substantial.

The facts indicate an appalling lack of regard on the part of Swiss Bank for the more than reasonably foreseeable possibility that the negligent maintenance of its for-eign exchange telex machines could result in substantial damage to one of its customers. The burden of guarding against such a possibility is minimal in view of the potential injury involved. As between Hyman-Michaels and Swiss Bank, the negligence and carelessness of Swiss Bank is the proximate cause of the loss suffered by plaintiff Hyman-Michaels.

Plaintiff also alleges breach of fiduciary duty on the part of defendant Swiss Bank. Plaintiff has failed to prove, however, the existence of such a duty.

The courts have invariably held that a fiduciary relationship exists only when confidence is reposed on one side and there is a resulting superiority and influence on the other side. *People ex rel. Barrett v. Central Republic Trust Co.*, 300 Ill. App. 297, 302–03, 20 N.E.2d 999, 1001–02 (1st Dist. 1939). Although plaintiff may have reposed confidence in Swiss Bank to the extent that anyone reposes trust and confidence in a commercial bank, there is no evidence that Swiss Bank exercised any superiority or influence over plaintiff. Swiss Bank's role in the transaction was that of correspondent bank to Continental and, as such, its relationship to plaintiff was governed solely by the contractual relationship which existed between plaintiff and Continental. Accordingly, the court finds that Swiss Bank did not breach any fiduciary duty to Hyman-Michaels in connection with Swiss Bank's failure to properly handle the telex payment order.

### SWISS BANK'S THIRD–PARTY COMPLAINT

Swiss Bank filed a third-party complaint against Continental alleging that it is entitled to indemnity from Continental for any damages imposed on Swiss Bank in favor of plaintiff. Swiss Bank claims that Continental's actions were the primary and proximate cause of any loss or damage suffered by Hyman-Michaels in that: (1) Continental should have recommended a payment procedure to Hyman-Michaels that would have allowed more lead time for payment of the

charter installment; (2) Continental carelessly and negligently sent the telex message of April 26, 1973 to the wrong telex machine; and (3) Continental was careless and negligent in its actions subsequent to being advised on April 27, 1973 that the charter installment payment had not been made to the owner's account.

Third-party defendant Continental argues that, in order to prevail against Continental, Swiss Bank must prove as a matter of law (1) that Swiss Bank's negligence was only passive negligence and (2) that Continental's conduct constituted active negligence such that it was the major cause of the injury sustained by plaintiff.

At the time this case arose, no contribution among joint tortfeasors was allowed in Illinois.[6]

In *Carver v. Grossman*, 55 Ill.2d 507, 305 N.E.2d 161, 163 (1973), the court observed: "Where indemnity has been allowed the conduct of the indemnitor has usually been characterized as the primary cause or active negligence while that of the indemnitee has been characterized as the secondary cause or passive negligence." Although no precise definition of the term "active" negligence has been articulated by the Illinois courts, the facts of *Carver* clearly illustrate what is contemplated by the use of the term.

Plaintiff Carver was employed by a gasoline service station. The owner of the station, Bishop, drove the automobile of a customer into a service bay and instructed Carver to change the oil and the oil filter. When Bishop got out of the car, he turned the engine off, but left the transmission in gear and the keys in the ignition.

As Carver stood in front of the car, working under the hood, Bishop told the owner of the car to check his gas. The owner turned on the ignition and the car started

and lurched forward, pinning Carver and causing him injuries.

Carver brought a common law negligence action against Grossman as administrator of the automobile owner's estate. Grossman filed a third-party complaint against Bishop, the employer, based on an implied indemnity theory. The complaint alleged that if the owner's estate was held liable to the original plaintiff, then the estate was entitled to full indemnification from Bishop because Bishop had been actively negligent and the owner had been passively negligent.

The trial court entered judgment against Bishop, the third-party defendant, in favor of Grossman, the third-party plaintiff, for the amount of a consent judgment previously entered against Grossman in favor of the original plaintiff. The Appellate Court affirmed. The Illinois Supreme Court reversed and remanded with directions, stating:

> We feel that the evidence in this case fails to establish Grossman's right to indemnity from Bishop, the owner of the service station, because the evidence clearly establishes that his decedent, Putnam, was himself guilty of active negligence.
>
> \*    \*    \*    \*    \*    \*
>
> It was the negligent act of Putnam in starting the engine while the car was in gear without depressing the clutch or applying the brake that caused the car to move forward and strike Carver. We cannot characterize this negligence as passive so as to permit the shifting of the entire responsibility from him to Bishop for injuries to which he very substantially contributed. It cannot be said that the principal or moving cause of the injury was the act of Bishop and that Putnam simply failed to discover or correct the

---

**6.** The law changed subsequent to 1973. *Skinner v. Reed-Prentice Division Package Machinery Co.*, 70 Ill.2d 1, 15 Ill.Dec. 829, 374 N.E.2d 437 (1978), permitted contribution among joint tortfeasors. In 1979, the Illinois legislature codified *Skinner* by expressly permitting actions for contribution among joint tortfeasors. The new Illinois statute and *Skinner* only ap-

ply, however, to causes of actions arising out of occurrences on and after March 1, 1978. *Ill. Rev.Stat.*, ch. 70, § 301 *et seq.* (1979); 70 Ill.2d at 17, 15 Ill.Dec. 829, 374 N.E.2d 437. Consequently, the only theory upon which Swiss Bank can recover damages from Continental is the theory of implied indemnity.

situation which Bishop had created. Nor can Bishop be said to be the "principal wrongdoer" or the one whose wrong has been principally responsible for the injury. (Citations omitted)

305 N.E.2d at 163–164.

The evidence in this case has failed to establish Swiss Bank's right to indemnification from Continental. Regardless of whether Continental had advised Hyman-Michaels to allow more lead time in initiating the charter installment payment, and Hyman-Michaels had in fact initiated the payment sooner, Swiss Bank's negligent procedures would have precluded either party from becoming aware of the non-payment until notification by the owner. Similarly, Continental's decision to retransmit the April 25 telex instruction to the machine in Swiss Bank's Foreign Exchange Department can hardly be characterized as the "primary cause" of plaintiff's injuries. The telex machine in question "answered back" that the message had been received. Once that transmittal was confirmed, Continental no longer had any control over the payment. There is no question that, but for Swiss Bank's negligence, Hyman-Michaels' losses would not have occurred.

The court finds that Continental's actions subsequent to April 27, 1973 are irrelevant. The facts simply do not allow the court to characterize Swiss Banks negligence as passive so as to permit the shifting of the entire responsibility for plaintiff's injuries to Continental.

## THE COUNTERCLAIMS

Continental filed a counterclaim against Hyman-Michaels seeking recovery from Hyman-Michaels for all or part of the damages for which Continental might be found liable to Swiss Bank.[7] Continental, as well as Swiss Bank, contends that Hyman-Michaels is barred from recovery by its contributory negligence and assumption of the risk of delays.

Defendants argue that the fact that plaintiff was previously involved in an arbitration proceeding, at which time it was put on notice that the payment provision of the Charter would be strictly enforced, required that plaintiff allow sufficient lead time in which to make the Charter payment. Defendants claim that because plaintiff knew that errors and delays may occur in the transmission of telex messages, plaintiff should have allowed even more lead time in making the Charter payment than the three days actually allowed.

The court concludes that plaintiff was not guilty of contributory negligence as a matter of law. The evidence shows that plaintiff initiated payment of the Charter installment at or about 9:17 A.M. on April 25, 1973, thereby allowing a three business day lead time for completion of the transaction. Plaintiff telephoned Continental at the aforementioned time and requested that a wire transfer of the funds be made to the account of the Pandora's owner at Banque de Paris. Payment of the installment was due at or before 2100 hours (9 P.M.) Geneva time on April 27, 1973.

The testimony at trial established that telex communication is essentially instantaneous. Although Continental waited until 4:36 P.M. (Chicago time) to send the telex message to its London branch for retransmission to Swiss Bank, the message still reached London in time for the start of business on April 26.

Continental's London Branch retransmitted the telex message from Continental to Swiss Bank on the morning of April 26, 1973 and, according to the "answer-backs" received by Continental's London Branch operator, Swiss Bank received the retransmission at approximately 9:52 A.M. Geneva time. Swiss Bank had most of the business day of April 26 and all of April 27 in which to transmit the telex to Banque de Paris.

The court finds that three days was sufficient lead time for completion of the transaction in question. There is no evidence that a longer lead time would have insured a different outcome, given the customary

---

**7.** Continental's motion to have its counterclaim treated as an affirmative defense is denied.

procedures of the defendant banks. Continental issued its standard advice form to plaintiff confirming that plaintiff's account had been debited for the requested amount and that Continental was proceeding to execute the wire transfer.

Hyman-Michaels was entitled to assume that Continental and any correspondent bank employed by Continental would use due care in carrying out the transaction. Hyman-Michaels did not employ and was not obligated to employ a confirmation procedure independent of any employed by the banks executing the transaction. Consequently, Hyman-Michaels first learned of the non-receipt of the funds when notified by the owner of the Pandora of the withdrawal on April 27, 1973. Even with a longer lead time, plaintiff still would not have learned of the non-receipt of the nineteenth installment until notified by the owner on April 27.

Defendants also allege that Hyman-Michaels' claim is barred by the exculpatory provision on the reverse side of the Continental advice form. Plaintiff claims that it never signed or otherwise agreed to the supposed exculpatory clause and that, in any event, the language in question applies only to Continental and not to liability asserted against its correspondent, Swiss Bank.[8]

■ Under Illinois law, a court need not enforce a contractual clause exempting a party from liability for its own negligence unless "it is clear from the contract that the parties' intent was to shift the risk of loss" and it would not be against the "settled public policy of the state to do so . . . ." *Rutter v. Arlington Park Jockey Club*, 510 F.2d 1065 (7th Cir. 1975); *citing Jackson v. First National Bank*, 415 Ill. 453, 460, 114 N.E.2d 721, 725 (1953).

■ After considering all the evidence, the court finds that there was no intent on the part of Hyman-Michaels to shift the risk of loss. The transaction in question was consummated over the telephone. Continental's advice form was merely a confirmation that the transaction had been carried out as requested. None of the employees or officers of Hyman-Michaels ever signed the advice form and there is no evidence that the exculpatory clause was ever brought to their attention.

Although Illinois courts have often upheld exculpatory clauses relieving a party from liability for negligence in performing a contractual obligation, the cases involve agreements signed by both parties in which the intent to accept such a clause is clear. *See e. g., Rutter v. Arlington Park Jockey Club, supra; Morrow v. Auto Championship Racing Association, Inc.*, 8 Ill.App.3d 682, 291 N.E.2d 30 (1972); *Owen v. Vic Tanny's Enterprises*, 48 Ill.App.2d 344, 199 N.E.2d 280 (1964).

Continental's advice form may be likened to an adhesion contract in which a consumer has no choice but to accept an exculpatory provision. Because the exculpatory clause is part of a standard form contract, its validity is open to question. In the instant case, however, the court finds only that Hyman-Michaels' claim is not barred by the exculpatory clause of the advice form because there is no evidence that Hyman-Michaels was aware of or accepted that provision of the contract.

In response to Continental's counterclaim, Hyman-Michaels filed a counterclaim against Continental, alleging negligence, breach of contract, and breach of fiduciary duty. As previously discussed, the court finds no liability on the part of Continental for any injury suffered by plaintiff in this action.

---

**8.** The clause in question provides as follows: It is fully understood and agreed that no liability shall attach to the Continental Illinois National Bank and Trust Company of Chicago (hereinafter referred to as Bank), nor to its correspondents, for any loss or damage occasioned by delay in, failure of, or error in cable, telegraph, or telex transmission of messages, or error in identification of payee, or by acts or omissions of correspondents or agencies employed by the Bank, or for any cause beyond Bank's reasonable control.

## DAMAGES

The final issue to be resolved is the extent of the damages to which plaintiff is entitled. Plaintiff claims it is entitled to profits lost as a result of the withdrawal of the Pandora, as well as costs and attorney's fees for the 1973 arbitration. Defendant Swiss Bank argues that it should not be held accountable for damages which it could not have foreseen.

Swiss Bank contends that, under contract theory, the lost profits claimed by Hyman-Michaels are consequential or special damages. Swiss Bank relies on the traditional rule first announced in *Hadley v. Baxendale*, 9 Exch. 341 (1854). In *Hadley*, the Court of Exchequer held that consequential damages may include only those "as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." Because Swiss Bank did not know the details of the transaction in question, it claims that Hyman-Michaels should be denied lost profits as part of the damages awarded.

Lost profits are an appropriate item of damages where there is a causal connection between defendant's conduct and plaintiff's injury and where the amount of the damages can be determined with reasonable certainty. *See Mercury Cleaning Systems, Inc. v. Manitowoc Engineering Corp.*, 255 F.2d 318 (7th Cir. 1958). As discussed above, the conduct of Swiss Bank was clearly the proximate cause of plaintiff's injury. The expert testimony of plaintiff's witness, Haas, demonstrated to the court's satisfaction that plaintiff's lost profits can be calculated with reasonable certainty. Thus, plaintiff is entitled to damages for the profits it lost due to the withdrawal of the Pandora.

Swiss Bank's argument that the extent of plaintiff's injury was not foreseeable is unpersuasive. The fact that plaintiff was transferring funds by wire rather than through the mail was sufficient to alert Swiss Bank to the importance of the transaction. In addition, Swiss Bank was aware of the fact that the telex machines in the Foreign Exchange Department were receiving three or four diverted messages per week which could involve large sums of money. Swiss Bank, as a major international bank, could reasonably foresee that failure to act promptly upon receipt of such a telex message could result in substantial damage to a customer of the bank.

Swiss Bank also claims that the proper measure of damages for the loss of the Pandora is the replacement cost of the vessel. Swiss Bank argues that Hyman-Michaels could have substantially reduced its losses if it had hired a vessel to replace the Pandora, and that Hyman-Michaels had a duty to do so.

Hyman-Michaels claims that it has no duty to cover or mitigate where to do so creates a substantial risk of further damages. In addition, plaintiff claims that defendants' computation of damages, using a replacement cost analysis, greatly undervalued plaintiff's damages.

In *Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank of Evans City*, 611 F.2d 465 (3rd Cir. 1979), one of the issues before the court was whether a seller is required to mitigate any damages it incurs by virtue of a wrongful dishonor of drafts submitted pursuant to a letter of credit. In discussing the concept of "duty to mitigate", the court stated:

> The term "duty to mitigate" damages has been interpreted to mean that "damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and therefore, are not to be charged against him." 11 Williston on Contracts, § 1353 at 274 (3d ed. 1968). When mitigation is appropriate, the test to be applied to the plaintiff's conduct is whether the conduct taken in response to the defendant's breach was reasonable. (Citations omitted). Reasonable conduct "is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the

problem was presented." (Citations omitted).

611 F.2d at 471.

The evidence has shown that Hyman-Michaels would have assumed a substantial additional risk had it undertaken to charter a replacement vessel at the time it lost the Pandora. By April of 1973, shipping rates were one hundred percent higher than they had been when plaintiff entered into the Pandora charter. Although the rates, in fact, continued to increase for a period of time after April of 1973, plaintiff's decision not to re-charter was reasonable at the time the problem was presented. Because of the undue risk involved, plaintiff was under no duty to mitigate damages.

■ Hyman-Michaels also seeks to recover $15,952.65 in attorneys' fees which it incurred in the second arbitration proceeding. Defendant claims that plaintiff is not entitled to recover these fees. Defendant relies on *Garris v. Schwartz*, 551 F.2d 156, 159 (7th Cir. 1977), which held that "as a general rule under Illinois law, attorneys' fees and expenses are not recoverable as an element of damages in a suit brought to enforce a common law duty" unless plaintiff's complaint fits a recognized exception to that rule.

Plaintiff in *Garris* was attempting to recover fees incurred in litigation, caused by defendant, between plaintiff and a third party. The court found that recent decisions of the Illinois Appellate Court extended the general rule quoted above to exclude recovery of attorneys' fees and expenses incurred in litigation with third parties. 551 F.2d at 158.

A recent Illinois Appellate Court case specifically rejects the interpretation of Illinois law set forth in *Garris*. In *Sorenson v. Fio Rito*, 90 Ill.App.3d 368, 45 Ill.Dec. 714, 718–19, 413 N.E.2d 47, 51–52 (1st Dist., 1980), the court held that plaintiff could recover her attorneys' fees, stating:

> The general rule in Illinois is that one who commits an illegal or wrongful act is liable for all of the ordinary and natural consequences of his act. (*Philpot v. Taylor*, (1874), 75 Ill. 309; *Bimba Mfgr. Co. v.*

*Starz Cylinder Co.* (1969), 119 Ill.App.2d 251, 256 N.E.2d 357; 15 Ill.L. & Prac. *Damages*, § 32 (1968).) Logically, this would include any attorneys' fees expended in bringing a lawsuit against the wrongdoer. However, because it was felt that the allowance of attorneys' fees would deter a litigant from prosecuting or defending an uncertain claim, the "American Rule" was adopted as an exception to the general rule. The Supreme Court stated the rationale for the "American Rule" as follows:

> In support of the American Rule, it has been argued that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel. *Fleischmann Distilling Corp. v. Maier Brewing Co.* (1967), 386 U.S. 714, 718 [87 S.Ct. 1404, 1407, 18 L.Ed.2d 475].

> It is clear from this statement that the policy against awarding attorneys' fees was intended to apply only where a successful litigant seeks to recover his costs in maintaining the lawsuit. *We do not believe it was intended to preclude a plaintiff from recovering losses directly caused by the defendant's conduct simply because those losses happen to take the form of attorneys' fees.* The plaintiff here is not attempting to recover the attorneys' fees she expended in bringing this lawsuit. Rather, she seeks to recover losses incurred in trying to obtain refunds of tax penalties which were assessed against her solely as a result of the defendant's negligence. Had the plaintiff been forced to hire an accountant to repair the damage caused by the defendant's conduct, she would undoubtedly have been entitled to recover the accountant's fee as an ordinary element of damages. There is no basis in logic for denying recovery of the same type of loss merely because the plaintiff required an attorney instead of an accountant to correct the situation caused by the defend-

ant's neglect. In holding the defendant liable for the plaintiff's losses, we are not violating the policy against 'penalizing' a litigant for defending a lawsuit. We are simply following the general rule of requiring a wrongdoer to bear the consequences of his misconduct. (Emphasis added).

The reasoning of *Sorenson* is particularly applicable to the instant case. Hyman-Michaels is not seeking to recover attorneys' fees incurred in this litigation. Rather, Hyman-Michaels is seeking to recover all the damages it suffered as a result of Swiss Bank's negligence. The attorneys' fees incurred by Hyman-Michaels in the second arbitration are an appropriate part of those damages and are not unreasonable in view of the amount of work involved.

Finally, Hyman-Michaels is entitled to one hundred percent of its damages. There is no evidence that the Pandora was part of the joint venture agreement between Hyman-Michaels and Schiavone-Bonomo or that such was ever the intent of the parties.

Accordingly, it is ordered that judgment be and the same is hereby entered in favor of plaintiff Hyman-Michaels and against Swiss Bank in the amount of Two Million One Hundred Thirty Seven Seven Hundred Thirty One and 65/100 Dollars ($2,137,-731.65) plus costs.[9]

---

9. Loss of net earnings was computed by Hyman-Michaels as follows:

M/V PANDORA – LOSS DUE TO WITHDRAWAL OF VESSEL

| | | |
|---|---|---|
| Cost if Charter had continued | | $ 894,650 |
| Earnings if Charter had continued * | | |
| 5/30 – 7/29  61 days at $5000 = | $ 305,000 | |
| 7/30 – 9/29  62 days at $5967 = | 369,954 | |
| 9/30 – 11/29  61 days at $6040 = | 368,440 | |
| 11/30 – 1/29/74  61 days at $7100 = | 433,100 | |
| 1/30 – 3/29  59 days at $6710 = | 395,890 | |
| 3/30 – 8/27  151 days at $7570 = | 1,143,070 | |
| Total estimated revenue | | $3,015,454 |
| Loss of net earnings | | $2,120,804 |

* Estimated daily revenue is based on actual reported fixtures on roundtrips for the dates corresponding to the above periods. The fixtures were reported in the Maritime Research, Inc. Bulletin with the exception of the last period (3/30 – 8/27  1974) which is based on Hyman-Michaels charter of the M/V STOMOLEON for a period of 6 months.

| Total amount of damages caused by loss of Pandora: | |
|---|---|
| Lost profits | $2,120,804.00 |
| Attorney's fees for 1973 arbitration | 15,952.65 |
| Fees paid for arbitration | 975.00 |
| | $2,137,731.65 |