509 P.2d 738

**Roy C. SWINGLE, Appellant,**

v.

**Joseph MYERSON, Appellee.**

**No. 2 CA–CIV 1313.**

Court of Appeals of Arizona, Division 2.

May 9, 1973.

Gerald B. Hirsch, Tucson, for appellant.

Bilby, Thompson, Shoenhair & Warnock, P. C. by Harold C. Warnock, Tucson, for appellee.

HOWARD, Judge.

Appellant-defendant Swingle appeals from a $6,000 judgment rendered against him at a trial before the court. The issues in this case revolve around whether appellee-plaintiff Myerson is entitled to recover a "finder's fee" on the basis of *quantum meruit.*

The facts considered in the light most favorable to supporting the judgment of the trial court are as follows. In May, 1969, Swingle was a vice-president of Tucson Federal Savings & Loan Association. Myerson was a Tucson businessman related by marriage to the Capin family of Nogales, Arizona who then controlled the Security Savings and Loan Association. While Swingle and Myerson were at lunch with several other persons, Myerson remarked to Swingle that it was too bad that Swingle's company was not interested in a savings and loan company that he knew was available for acquisition. Swingle then told Myerson that although his company was not interested, he was. After lunch Swingle accompanied Myerson to the latter's office at which time Swingle inquired about the savings and loan company and gave Myerson two conditions which had to be met before he would consider purchasing its stock. The conditions were that a Tucson branch of the savings com-

pany be established and that he acquire at least 51% of the stock. He also told Myerson that he must remain anonymous because he was still employed by Tucson Federal Savings & Loan Association.

Mr. Myerson then called Zellie Capin and told him that he had a good savings and loan man who was interested in buying the stock of Security Savings and Loan. At this time Myerson also advised Swingle that he expected to be compensated for bringing these people together if a transaction was effected. Myerson made arrangements for Zellie Capin to come to Tucson to meet Mr. Swingle. Mr. Capin told Myerson that all the information on Security Savings was in the hands of its accountant, Mr. Aaron Paul. Myerson and Swingle then met with Mr. Paul to obtain further information on the corporation.[1] After this meeting Swingle, Myerson and Capin met in Tucson at which time Mr. Swingle and Mr. Capin agreed upon the price per share that Swingle was willing to offer for the shares of stock in Security Savings. Swingle's proposal was presented to the other board directors of Security Savings who accepted it and then made efforts to obtain from other shareholders in the corporation enough shares in the stock to satisfy Mr. Swingle. Eventually the directors were able to procure for Swingle 62% of the stock of Security Savings. Swingle then resigned from Tucson Federal Savings & Loan Association and the 62% of the shares were purchased by and transferred to him.

Just prior to the stock transfer, Myerson reminded Swingle of his agreement to compensate him. Swingle told him that there was going to be a meeting of the new board of directors and he felt that the rest of the board should participate in the payment of the fee because they were all going to benefit from it. Swingle told him that he would contact him as soon as the meeting was over. Later, Swingle came to Myerson's office with a letter from the State Banking Superintendent referring to some rules and regulations pertaining to banking. This letter stated as follows:

"Dear Mr. Swingle:

In answer to your letter dated February 5, 1970, please be advised that prior approval of the Superintendent as required by Section 6–427.B, A.R.S. was not requested or granted to pay to any person any commission or other compensation for obtaining any subscription to or sale of shares of Security Savings and Loan Association guaranty capital stock.

If such a request for prior approval is received the request will be denied. .  .  ."

Based on this letter, Swingle refused to make any payment to Myerson.

Myerson filed this action alleging that Swingle was indebted to him in the sum of $6,000 as a finder's fee under an oral contract. The trial court found that " .  .  . although there was no express contract between the parties, the plaintiff expected to be paid for his services as a finder of a business opportunity and · had communicated his expectation to the defendant and that said services were beneficial to the defendant in that the defendant obtained not less than 51% of the issued and outstanding guaranty capital stock of Security Savings and Loan Association and the Security Savings and Loan Association was authorized by the Superintendent of Banks of the state of Arizona to establish and maintain a branch office at Tucson, Arizona, thus fulfilling the two conditions which the defendant had informed the plaintiff were the conditions pursuant to which he would be interested in obtaining control of Security Savings and Loan Association, thereby entitling the plaintiff to a reasonable finder's fee on a *quantum meruit* basis, .  .  . " and awarded judgment to the plaintiff in the sum of $6,000.

---

1. According to Myerson, he and Swingle agreed at this meeting that Myerson's commission would be $12,000, but that this sum was later reduced by agreement to the sum of $6,000.

Appellant presents the following questions for review:

"1. Can one receive a 'finder's fee' without having a contract, written or oral, to receive one, and in face of a court's determination that there was no agreement to pay such finder's fee?

2. Did the plaintiff find or introduce to the defendant a sufficient number of persons willing to sell their stock in Security Savings & Loan Association in order that defendant might acquire a controlling interest therein as alleged in the complaint?"

■ Appellant contends that since the court found no "express contract" appellee cannot recover. We do not agree. It is clear that the judgment was based on an *implied contract*. There is no difference in the legal effect between an express contract and an implied contract. *All* contracts are express contracts. But there are different modes of expressing assent. 1 Corbin on Contracts § 18, p. 39 (1963). If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one. But if such agreement can only be shown by the acts and conduct of the parties, *interpreted* in the light of the subject matter and the circumstances, then the contract is an implied one. These terms, however, do not denote different kinds of contracts, but merely have reference to the evidence by which the agreement between the parties is shown. Shelly v. Bristol Sav. Bank, 63 Conn. 83, 26 A. 474 (1893).

There is a well-defined rule of law, applicable to contracts in general, that where the relations between the parties have been such as to justify the offeror in expecting a reply, or where the offeree has come under some duty to communicate either a rejection or acceptance, his failure to communicate his rejection may result in a legal assent to the terms of the offer. Lechler v. Montana Life Ins. Co., 48 N.D. 644, 186 N.W. 271 (1921); American Aviation, Inc.

v. Hinds, 1 Wash.App. 959, 465 P.2d 676 (1970); 17 C.J.S. Contracts § 41 p. 670 (1963); 17 Am.Jur.2d Contracts § 47 (1964).

Restatement, Contracts § 72, states:

"§ 72. Acceptance by Silence or Exercise of Dominion.

(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases and in no others:

(a) Where the offeree with reasonable opportunity to reject offered services takes the benefit of them under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation.

\* \* \* \* \* \* "

■ When Myerson made the initial call to Capin and communicated to Swingle his terms and expectation of compensation, Swingle was under a duty at that time to reject Myerson's services. He did not do so. Although Myerson only agreed to find a business opportunity for Swingle, he did more. He accompanied Swingle to the office of the Secretary-Treasurer of the company, discussed the financial aspects of the proposed transaction, and arranged a meeting in his office between Capin and Swingle which resulted in Swingle's offer to buy the controlling shares. A later progress report meeting was held in Myerson's office with the Secretary-Treasurer and Swingle. Swingle sat back idly, accepting Myerson's efforts, and never indicated to Myerson rejection of his proposal. The evidence supports the trial court's conclusion that *quantum meruit* is a proper measure of the value of the services agreed upon.

Appellant next maintains that oral agreements to pay finder's fees are fraught with danger and provide a fertile ground for the assertion of unfounded claims. He concedes, however, that such contracts not involving real property or mines are not within the penumbra of our Statute of

Frauds, A.R.S. § 44–101. This court cannot by judicial ukase amend the statutes.

Appellant further contends that in order for appellee to be entitled to a finder's fee he must have been the "efficient, proximate and procuring cause" of the transfer of the stock and the establishment of the branch office in Tucson. Appellant points out that the persons actually responsible for his acquiring the stock were Zellie Capin and other members of the board of directors who solicited enough shares of stock from shareholders to satisfy the amount of interest in the corporation he desired. We are unable to agree with this contention. The only service which Myerson undertook was to find the business opportunity for Swingle. He told Mr. Swingle that he " . . . expected to be compensated for bringing these people together if a transaction was made."

The scope of Myerson's required performance is measured by the terms of the agreement. The record supports the trial court's determination that Myerson had fulfilled his part of the bargain.

Affirmed.

JACOBSON and HAIRE, JJ., concur.