DE WITT COUNTY PUBLIC BUILDING COMMISSION, Plaintiff-Appellee, v. THE COUNTY OF DE WITT, Defendant-Appellant.

Fourth District No. 4—83—0823

Opinion filed September 25, 1984.—Rehearing denied November 2, 1984.

12

Mercer Turner, of Bloomington, for appellant.

Phillip Lamkin, of Lamkin & Lamkin, P.C., of Clinton, for appellee.

PRESIDING JUSTICE MILLS delivered the opinion of the court:
Public Building Commission (PBC) lease.

The De Witt County board (board) says it's invalid because it obligates the PBC to do *nothing*.

We disagree—the parties would not have entered into such an agreement absent a mutual intent that each be bound to do *something*!

Nor do any of the other counts of the board's affirmative defenses allege facts legally sufficient to render the lease invalid.

Accordingly, we affirm *in toto*.

The facts underlying this dispute can be simply stated. In order to finance the construction of a new county building, the board on March 26, 1982, adopted a resolution creating a Public Building Commission pursuant to the Public Building Commission Act. (Ill. Rev. Stat. 1981, ch. 85, pars. 1031 through 1054.) On November 3, 1982, the board, pursuant to a resolution of the same date, entered into a lease agreement with the PBC.

On December 13, 1982, the board rescinded its prior resolution providing for the execution of the above lease, and on February 28, 1983, the board attempted to dissolve the PBC. The first PBC's debts were purportedly assumed by a second public building commission. (The term "PBC," when used in this opinion, refers to the first PBC

created on March 26, 1982.)

On March 4, 1983, the PBC filed a complaint for declaratory judgment, requesting a declaration that the lease was valid and binding on the county of De Witt (county), and that the county was obligated to make payments at the times and in the amounts specified in the lease.

On July 13, 1983, the circuit court granted the board leave to file affirmative defenses. The board's defenses were that the lease in effect provides for an impermissible contingency fund in excess of 5%, lack of mutuality of obligation in the lease and inadequacy of consideration, breach by the PBC of a fiduciary relationship subsisting between it and the county, the validity of the board's resolution providing for rescission of the resolution authorizing execution of the lease on the ground that the former resolution was a reasonable "act of legislative discretion," and nonexistence of the lease due to the purported dissolution of the PBC. On the same day, the court granted the PBC's motion to dismiss these defenses. However, the court granted the board leave to file amended versions of the lack of mutuality, breach of fiduciary relationship and nonexistence of the lease defenses, which the board did on July 6, 1983. On August 24, 1983, these amended defenses were dismissed on the PBC's motion.

The court granted the PBC's motion for judgment on the pleadings on September 30, 1983. As the basis for its decision, the court held that neither party alleged ambiguity in the language of the lease, that the language of the lease was clear and unambiguous and expressed the intent of the parties to the lease at the time that they entered into it, and that the lease, as written, was enforceable against the parties. The board appeals this decision.

For purposes of this litigation, the salient terms of the lease are as follows: (1) The PBC, with reasonable promptness, shall issue bonds to finance the construction of the new county building; (2) "any delay of any length to issue the Bonds shall not affect the irrepealable nature of the Lease" as long as any indebtedness is outstanding; (3) the PBC shall "as soon as practicable" enter into contracts for the construction of the building; (4) the PBC is authorized to make major changes in the plans and specifications for the building, the only prerequisite to the exercise of this power being a duty of prior consultation with the board; (5) the PBC will use its best efforts to complete construction at the earliest possible date; however, failure to deliver possession of the completed building shall not relieve the county of its obligation to pay the fixed annual rentals specified by the lease; (6) "[d]etermination of the dates on which the County may assume possession [of the new building] shall be within the sole judgment of the

[Public Building] Commission ***''; (7) the term of the lease is 10 years; (8) rental in the amount of $700,000 is due on November 1 of each year from 1983 through 1992; (9) the county shall levy taxes at an increased rate sufficient to pay rent under the lease, and additional taxes levied for this purpose shall not be used for any other purpose; (10) upon payment of all of the PBC's bond and other indebtedness, the unexpended balance in "all accounts of the revenue fund established by the Bond Resolution" shall be returned to the county; and (11) the total estimated all-inclusive cost of the project is $2.5 million. (This last item appears in the preliminary recitals section of the lease.)

The paragraphs of the lease upon which the board relies as support for its assertions that the lease lacks mutuality of obligation and is unsupported by adequate consideration are set out below in their entirety:

"SECTION VI
NONCANCELLABLE

This Lease shall be deemed and construed to be noncancellable by the county during the term hereof, and the county shall pay to the Commission absolutely throughout the term of this Lease the rent and all other payments required hereunder, free of any deductions, without abatement, deduction or setoff for any reason or cause whatsoever including, without limiting the generality of the foregoing:

(i) The failure, for whatsoever cause, to acquire the Site and to complete the Project, or the failure from whatsoever cause of the Project to comply in any respect or respects with said plans and specifications;

(ii) The failure to acquire the Site and to complete the Project thereon at or before the beginning of the term of this Lease;

(iii) Any damage to or destruction of the demised premises or any part thereof, or any delay, interruption or prevention from any cause whatsoever of the use of [sic] occupancy of the demised premises or any part thereof, and whether or not resulting from any act of God or the public enemy, or from any restriction or requirement of law, ordinance, rule or regulation of any public body or authority, state or federal, having jurisdiction over the demised premises (whether such restrictions or requirements relate to the use or occupancy of the demised premises or the quality, character or condition of the demised premises, or any part thereof, including the buildings, improvements, and equipment thereon or therein, or otherwise);

(iv) Any failure of or any defect in the Commission's title to the demised premises whether or not such failure or defect interferes with, prevents or renders burdensome the use or occupancy of the demised premises or any part thereof;

(v) Any failure in whole or in part of the Commission to obtain and maintain the insurance which is provided to be maintained by the Commission under this Lease and paid for by the county;

(vi) Any failure in whole or in part of the Commission to perform all or any of its other obligations express or implied, to or for the benefit of the county, whether such obligations are provided for in this Lease, result from operation of law, or are provided for in or result from some other contract or agreement at any time or from time to time entered into between the Commission and the County."

OPINION

The board contends that the circuit court erred in entering judgment on the pleadings because its affirmative defenses raised important factual issues as to which the trial court should have heard evidence. The board further contends that in view of its denial of the PBC's allegation that the PBC would suffer substantial harm in the absence of a declaration of the rights of the parties to this controversy, the PBC did not establish that it was subject to injury as a result of the board's December 13, 1982, resolution and thus did not fulfill one of their prerequisites for obtaining declaratory relief.

■ The board's last mentioned contention is entirely without merit. The existence of the possibility of imminent harm is not a prerequisite to declaratory relief. Rather, only the following need be established in order to secure a declaratory judgment: "(1) [a] plaintiff with a legal tangible interest; (2) a defendant having an opposing interest; and (3) an actual controversy between the parties concerning such interests, though there need not be any act in violation of any such interests." *Griffin v. County of Cook* (1938), 369 Ill. 380, 398, 16 N.E.2d 906, 915.

The board's reliance on *Berg v. City of Chicago* (1968), 97 Ill. App. 2d 410, 240 N.E.2d 344, as support for its position on this issue, is misplaced. There the court held that in the absence of justiciable controversy, it is necessary to establish the existence of a danger of a plaintiff's sustaining some immediate injury as a result of enforcement of a municipal ordinance in order to secure a declaratory judgment that the ordinance is invalid. Although the board contends that

"nothing in the complaint indicates that the plaintiff [PBC] opposes the alleged actions of the defendant [De Witt County]," the existence of a justiciable controversy, as well as both of the other elements necessary to secure declaratory relief, is evident when the PBC's complaint is considered as a whole.

■ The board, relying on *Dorin v. Occidental Life Insurance Co.* (1971), 132 Ill. App. 2d 387, 270 N.E.2d 515, further contends that the existence of affirmative defenses automatically precludes a judgment on the pleadings. *Dorin* contains no statement to that effect. Instead, the court simply held that since the affirmative defenses there asserted would, if proved, constitute a legal defense to the plaintiff's right to recover, the trial court erred in entering judgment on the pleadings.

■ It is elemental that if affirmative defenses do not allege facts which, as matters of law, constitute defenses to the plaintiff's cause of action, the defenses may be summarily dismissed (see *Supreme Lodge Knights of Pythias v. McLennan* (1897), 69 Ill. App. 599, *aff'd* (1898), 171 Ill. 417, 49 N.E. 530). Following the proper dismissal of all affirmative defenses, a cause stands as if no affirmative defenses had been filed. Nonexistent affirmative defenses obviously cannot constitute a bar to a judgment on the pleadings.

Also in support of its position that the trial court improperly entered a judgment on the pleadings, the board, in its brief, asserts that *Augustine v. Chateau Homes, Inc.* (1975), 26 Ill. App. 3d 203, 324 N.E.2d 633, stands for the proposition that "the issue of whether a contract [is] sufficiently complete and definite is a question of law, but interpretations of *** real estate contract[s] *** should be made based upon what is reasonable as a matter of proof under the circumstances and conditions being explained at an evidentiary hearing." *Augustine* involved a contract for the purchase and construction of a new home. The trial court entered a judgment on the pleadings rescinding the contract on the ground that it was, as a matter of law, incomplete and indefinite and thus unenforceable. The appellate court reversed, holding that all of the details which the contract allegedly lacked either were unnecessary, were in fact included in the contract, or could be implied, and the specifics thereof established through the presentation of evidence.

■ In the present case, by contrast, there is no contention that any terms were inadvertently omitted from the contract. There is a question as to whether mutuality of obligation is present in the contract, but unlike in *Augustine,* resort to extrinsic evidence is unnecessary to resolve that question. Language is contained in the lease

which imposes very definite obligations on the PBC; the only question is whether the legal effect of other language contained in the lease is such as to negate those obligations. It is well established that where, as here, contractual language is clear and unambiguous, extrinsic evidence is inadmissible to explain the contractual terms (*URS Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 427 N.E.2d 1295), and the construction of the contractual language is a question of law for the court. *Rhoads v. Clifton, Gunderson & Co.* (1980), 89 Ill. App. 3d 751, 411 N.E.2d 1380.

This brings us to the question of whether the board's affirmative defenses were properly dismissed. We first consider the related defenses of lack of mutuality of obligation and inadequate consideration. We consider the former defense first.

■ In its most elemental sense, the doctrine of mutuality of obligation means that unless both parties to a contract are bound by its terms, neither is bound. (*Kraftco Corp. v. Koblus* (1971), 1 Ill. App. 3d 635, 274 N.E.2d 153.) In determining whether a contract such as that at issue is binding upon the parties thereto, several rules of construction are applicable.

■ A contract should be construed as a whole to give effect to the intention of the parties (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 458 N.E.2d 480), and great weight is to be given to the principal, apparent purpose and intention of the parties at the time that they entered into the contract. (*Cedar Park Cemetery Association, Inc. v. Village of Calumet Park* (1947), 398 Ill. 324, 75 N.E.2d 874; *Ancraft Products Co. v. Universal Oil Products Co.* (1981), 100 Ill. App. 3d 694, 427 N.E.2d 585.) Furthermore, every contract contains an implied promise of good faith and fair dealing between the contracting parties. Where an instrument is susceptible of two conflicting constructions, one of which imputes bad faith to one of the parties and one which does not, the latter construction should be adopted. (*Borys v. Josada Builders, Inc.* (1982), 110 Ill. App. 3d 29, 441 N.E.2d 1263.) It follows that a contract should be construed so as to make the obligations imposed by its terms mutually binding upon the parties, unless such a construction is wholly negated by the language used (*Minnesota Lumber Co. v. Whitebreast Coal Co.* (1895), 160 Ill. 85, 43 N.E. 774), and that contractual terms should be construed to avoid the conclusion that other terms are redundant or meaningless. *State ex rel. Skinner v. Lombard Co.* (1982), 106 Ill. App. 3d 307, 436 N.E.2d 566.

■ On the basis of the above-cited cases, we must interpret the disputed provisions of the present lease in such a manner as not to

render meaningless the PBC's obligations under the lease if that is at all possible. The lease explicitly provides that "[t]he Commission [PBC] shall ***, as soon as practicable, enter into and execute such contract or contracts as may be required for the construction of the [new county building] ***." In view of this quoted language, the clause, "[d]etermination of the dates on which the county may assume possession [of the new county building] shall be within the sole judgment of the Commission ***" should be construed as meaning that the PBC will make every effort to insure that the new county building is constructed in a timely manner, and that the PBC will deliver possession of the building to the county as soon as practicable following its completion, but that the PBC will not be liable for failure to deliver possession if the failure is due to circumstances completely beyond the PBC's control. Likewise, the provisions of section VI of the lease, providing that the county must continue to pay rent despite the possible occurrence of a large number of contingencies, must be construed as being applicable only in the face of such contingencies which occur through no fault of the PBC.

Our conclusion as to the meaning of the language at issue is supported by a large number of cases which hold that contractual language, which on its face gives one or the other of the parties an unbridled right to cancel or terminate the contract must, if possible, be construed so as to sustain the validity of the contract in question. Thus, a distribution agreement between a fabric manufacturer and fabric distributor which gives the manufacturer " 'the absolute and exclusive right to reject any orders for any reason whatsoever' " does not support a right on the part of the manufacturer to arbitrarily refuse to accept orders, since every contract contains an implied condition requiring the parties to deal with each other in good faith (*A.W. Fiur Co. v. Ataka & Co.* (1979), 71 App. Div. 2d 370, 372-73, 422 N.Y.S.2d 419, 421); a contract for the sale of plate glass which confers upon the buyer the option to cancel the order before shipment does not lack mutuality, because the manufacturer has one clear opportunity to enforce the contract by shipping the glass as soon as the order is received (*Gurfein v. Werbelovsky* (1922), 97 Conn. 703, 118 A.32); and a statement on a sales order that " '[we (the sellers)] will under no circumstances hold ourselves liable for failure to deliver any portion of orders taken, sometimes caused by circumstances over which we have no control,' " is not fatal to the validity of the sales contract, since such language may be interpreted as meaning that the sellers are bound to deliver unless circumstances beyond their control prevent them from doing so. *Bernstein v. W.B. Manufacturing Co.*

(1920), 235 Mass. 425, 427, 126 N.E. 796, 797.

Likewise, a contract giving an oil refinery the right to cancel the unshipped portion of an order for oil if for any reason it should discontinue making the grade of oil ordered does not lack mutuality, since in order to avoid the terms of the contract, the refinery would have to cease making the type of oil ordered (*Petroleum Refractionating Corp. v. Kendrick Oil Co.* (10th Cir. 1933), 65 F.2d 997), and a contract for the sale of sand to the government which states that "cancellation by the Procurement Division may be effected at any time" does not render the contract void, but instead implies a promise to accept delivery and pay for sand unless notice of cancellation is given within a reasonable time. "No one can read [such a contract] as a whole without concluding that the parties intended a contract to result from the Bid and the Government's Acceptance. If the United States did not so intend, it certainly set a skilful trap for the unwary bidders. No such purpose should be attributed to the government." *Sylvan Crest Sand & Gravel Co. v. United States* (2d Cir. 1945), 150 F.2d 642, 643.

Also, a lease of space for cigarette vending machines in a business establishment which provides that the machines can be removed "at any time, day or night, without liability," has been held to possess sufficient indicia of mutuality, on the basis of other language contained therein, providing that the term of the lease is three years, that either party can cancel the agreement upon 30 days' notice, and prohibiting the owners of the establishments from making cigarette sales by any means other than the machines. When such a contract is read as a whole and construed in light of the circumstances of the parties, the removal clause does not authorize termination at will of the machine owner's contractual obligations. *Silverstein v. Dohoney* (1954), 32 N.J. Super. 357, 362, 108 A.2d, 451, 454, *aff'd sub nom. Silverstein v. Keane* (1955), 19 N.J. 1, 115 A.2d 1.

Finally, in *Borys v. Josada Builders, Inc.* (1982), 110 Ill. App. 3d 29, 441 N.E.2d 1263, a contract for the purchase of a condominium provided that failure or inability on the part of the seller to deliver title as a result of defects therein which the buyer was unwilling to accept would terminate the contract, with the seller's liability limited to return of the buyer's deposit. The buyer contended that the seller's ability to control the quality of the title and its limited liability for breach of the agreement rendered the contract void for want of mutuality. The court held, however, that contractual clauses imposing an obligation on the seller to cause the unit to be sold and conveyed to the buyer, when read in view of the entire contract and construed in

accordance with the implied contractual term requiring the parties to act in good faith, supported the conclusion that the sellers did not have the right to arbitrarily decide not to sell by providing an inadequate title.

In holding that there is mutuality of obligation in the lease agreement at issue, we are aware that when confronted with quite similar contractual language, the first district of this court, as well as other courts, have reached the opposite conclusion. (See, *e.g., Miami Coca-Cola Bottling Co. v. Orange Crush Co.* (5th Cir. 1924), 296 F. 693; *Prather v. Vasquez* (1958), 162 Cal. App. 2d 198, 327 P.2d 963; *Haynes Auto Co. v. Turner* (1916), 18 Ga. App. 22, 88 S.E. 717; *Gardiakos v. Vanguard Communications, Inc.* (1976), 38 Ill. App. 3d 937, 350 N.E.2d 210; *Bernstein v. W.B. Manufacturing Co.* (1921), 238 Mass. 589, 131 N.E. 200; *Portland Gasoline Co. v. Superior Marketing Co.* (Tex. Civ. App. 1951), 240 S.W.2d 346; *American Agricultural Chemical Co. v. Kennedy & Crawford* (1904), 103 Va. 171, 48 S.E. 868; *Spooner v. Reserve Life Insurance Co.* (1955), 47 Wash. 2d 454, 287 P.2d 735.) However, these decisions fail to take account of the reality that in the business world, a purported contractual arrangement which places no obligation to perform upon one or the other of the parties, "is a kind of nonesuch, lacking any definable function." (L. Fuller & M. Eisenberg, Basic Contract Law 192 (3d ed. 1972).) Furthermore, this line of cases has been "criticized by competent text writers ***." (150 F.2d 642, 645.) Finally, in none of these cases was there as great a necessity for exempting one of the parties from liability for nonperformance due to circumstances beyond its control, as in the case at bar.

In the realm of governmental entities, public building commissions created pursuant to the Public Building Commission Act (Ill. Rev. Stat. 1981, ch. 85, pars. 1031 through 1054) occupy a unique position. The Public Building Commission Act, construed as a whole, leads one to the inescapable conclusion that the Act was designed to enable some units of local government, including counties, to acquire, construct or improve public buildings without the necessity of resorting to tax referendums to accomplish that purpose. (See Pavis, *Financing County Jail Improvements: The Need for Improvements*, 68 Ill. B.J. 412 (1980).) The commissions have the power to issue interim notes and long-term bonds (Ill. Rev. Stat. 1981, ch. 85, pars. 1044.1, 1045, 1046.1), but possess no taxing powers. Their only revenue derives from long-term leases to local governmental units of the facilities which they improve or construct, and local governmental units having taxing powers which enter into such leases must levy increased taxes

sufficient to pay the annual rental due under the terms of the leases. Ill. Rev. Stat. 1981, ch. 85, par. 1048.

Although the statute provides that amounts realized from the increased tax levies imposed for the purpose of making lease payments to public building commissions shall not be utilized for any other purpose until all rental payments due under the leases have been made, there is no statutory provision requiring units of local government to pay over such monies to public building commissions as the rent payments become due. In other words, there is nothing which would prevent a unit of local government from withholding rent payments from a public building commission for any reason, be it failure to perform according to the terms of the lease or otherwise.

In view of what has just been said, it does not require a great deal of insight to understand that few, if any, investors would be willing to purchase the short-term notes or bonds issued by public building commissions without ironclad assurance that the units of local government which create the commissions will make timely payment of all of the rent due the commissions. The lease provisions of which the board complains provide that assurance.

The need for the use of contractual language, which under normal circumstances might render the contract void for lack of mutuality, in order to provide protection against possible exigencies peculiar to the business or type of transaction involved, has not gone unrecognized by the courts. For instance, in *Richard Bruce & Co. v. J. Simpson & Co.* (Sup. Ct. 1963), 40 Misc. 2d 501, 503, 243 N.Y.S.2d 503, 505, an agreement by Bruce to market a new issue of Simpson's stock contained a "market out" clause, whereby Bruce had the power to terminate the agreement at any time, without obligation, if Bruce " 'in its absolute discretion' " determined that market conditions or prospects of the public offering of the stock were such as to make it " 'undesirable or inadvisable to make or continue the public offering ***.' " In holding that the contract did not lack mutuality, the court noted that under the contract Bruce would receive no compensation if it did not sell all of the stock within a stated time period, and that in the absence of such a clause, Bruce could have found itself under an obligation to use its best efforts to market the stock for a limited time period without hope of receiving any compensation whatsoever. Implicit in the *Bruce* opinion is the principle that peculiar characteristics and demands of a particular type of business or business transaction, coupled with the duty of good-faith dealing inherent in all contractual arrangements, may provide a basis for holding that a contract possesses the requisite mutuality of obligation, where there would be no

mutuality absent the peculiar characteristics of the transaction.

Here, as in *Bruce*, it is unlikely that there would be any contract at all absent the language which forms the basis for the contention of no mutuality. It follows that a holding that this contract lacks mutuality would have the practical effect of rendering the Public Building Commission Act a dead letter. The fact that a result which gives effect to a statutory scheme is preferable to one which does not (see generally *Pliakos v. Illinois Liquor Control Com.* (1957), 11 Ill. 2d 456, 143 N.E.2d 47; *Greyhound Lines, Inc. v. City of Chicago* (1974), 24 Ill. App. 3d 718, 321 N.E.2d 293) thus provides an additional basis for holding that the language of which the board complains does not render the lease void for lack of mutuality.

None of the three cases on which the board relies in support of its position that the lease lacks mutuality of obligation requires a different result. *Kraftco Corp. v. Koblus* (1971), 1 Ill. App. 3d 635, 274 N.E.2d 153, involved a purported oral contract premised solely upon a statement that Koblus would use its best efforts to sell Kraftco's products. The purported contract obligated Koblus to sell no specific quantity of Kraftco products. The court's decision was premised upon the extreme uncertainty and vagueness of the contractual terms. In the present case, by contrast, the contract contains clear and explicit language which spells out precisely what the contractual obligations of both parties are. The PBC is bound to fulfill the terms of the contract unless despite good faith efforts to perform, conditions beyond its control make fulfillment of its contractual obligations impossible.

In *Steinberg v. Keepper-Nagel Real Estate Investments, Inc.* (1973), 14 Ill. App. 3d 619, 303 N.E.2d 46, the purported contract, unlike the contract at issue in the present case, did not contain any definite time limit for its performance, and it permitted the defendant to terminate at will efforts to obtain the rezoning which was a stated prerequisite to execution of the contract. In holding that this purported contract was terminable at the will of either party, the court implied that a duty of good faith dealing between the parties should not be read into such an agreement. This decision is thus at variance with *Borys v. Josada Builders, Inc.* (1982), 110 Ill. App. 3d 29, 441 N.E.2d 1263, and other previously discussed cases, and we decline to follow it. Finally, the district court's decision in *Robert L. Haag, Inc. v. Swift & Co.* (S.D. N.Y. 1982), 530 F. Supp. 515), holding that the contract there at issue lacked mutuality, was reversed on appeal. *Robert L. Haag, Inc. v. Swift & Co.* (2d Cir. 1982), 696 F.2d 30.

■ The board also asserts as an affirmative defense that the lease is unsupported by adequate consideration. However, mutuality

of obligation provides a substitute for consideration in situations where, as here, the contract is wholly or largely executory and unperformed. (See *Armstrong Paint & Varnish Works v. Continental Can Co.* (1921), 301 Ill. 102, 133 N.E. 711.) Because of our conclusion that the lease imposes mutually binding obligations upon the parties, we need not determine whether it is supported by additional consideration.

The board's next affirmative defense is premised upon the disparity between the total amount of $7 million which the county is obligated to pay under the lease and the $2.5 million stated cost òf the new county building. The board asserts that the payments in excess of the cost of the building will result in a large surplus, in violation of the statutory provision which places a 5% (of total appropriations) limit on county appropriations for "contingent, incidental, miscellaneous, or general county purposes." Ill. Rev. Stat. 1981, ch. 34, par. 2102(e).

In our view, this defense is without merit for three reasons: First, the statutory scheme containing the provision upon which the board relies is entitled "An Act in relation to the budgets of counties not required by law to pass an annual appropriation bill" (the Counties Act) (Ill. Rev. Stat. 1981, ch. 34, par. 2101). In view of this explicit language, it would be illogical to assume that the legislature intended that this provision apply to appropriations of governmental units other than counties.

Second, the interpretation of this provision for which the board contends would render the 5% contingency or miscellaneous appropriations limitation applicable only to the budgets of public building commissions created by counties (as opposed to other units of local government), and would be virtually unworkable in the situation where a public building commission is jointly organized by more than one local governmental unit. (See Ill. Rev. Stat. 1981, ch. 85, par. 1034.) It is highly unlikely that the imposition of a limitation on the appropriations of some public building commissions in such an arbitrary manner would have been within the contemplation of the legislature.

Finally, the legislature has specifically exempted county funds used to lease premises from public building commissions from the county appropriations process by providing that counties may incur financial obligations with respect to such leases without making prior appropriations therefor. (Ill. Rev. Stat. 1981, ch. 34, par. 2104.) It would be unreasonable to conclude that the funds of public building commissions, the payment of which is exempt from the strictures of the county budgetary process, are nevertheless subject to the 5% con-

tingency and miscellaneous fund limitation applicable to county budgets.

The board also asserted as an affirmative defense that the lease is nonexistent because the PBC has been dissolved. The Public Building Commission Act provides:

"(a) Any Public Building Commission which has not issued any bonds and has no indebtedness may be dissolved upon the filing, by the presiding officer of the municipality, county seat or county board which organized such Commission, in the office of the Recorder of Deeds a copy of a resolution adopted by the governing body of such municipality, county seat or county board approving such dissolution." (Ill. Rev. Stat. 1981, ch. 85, par. 1052.1(a).)

The board's first set of affirmative defenses, which is verified, contains the statement: "The debts of the plaintiff [the PBC] were assumed by a new Public Building Commission."

 A local governmental unit may not have more than one public building commission at the same time. (Ill. Rev. Stat. 1981, ch. 85, par. 1034; see *De Witt County Taxpayers Association v. County Board* (1983), 112 Ill. App. 3d 332, 445 N.E.2d 509.) *Ergo*, the debts of the first PBC could never have been validly assumed by the second, since the alleged abolition of the first commission was ineffectual due to its outstanding debt, and a county may not create a second public building commission unless the first commission is legally dissolved. On remand of this cause for an evidentiary hearing, the board would be barred from introducing evidence to contradict the above statement indicating that the first PBC was indebted at the time of its purported dissolution, since, once having affirmed under oath that a particular state of facts exists, a party may not later assert that the contrary is true. (See *Finley v. Kesling* (1982), 105 Ill. App. 3d 1, 433 N.E.2d 1112.) Thus a hearing on the merits of this alleged affirmative defense would be meaningless, and the trial court did not err in dismissing it.

The final affirmative defense which the board argues on appeal is that the lease was the product of a breach of a fiduciary relationship existing between it and the PBC. The chief factual allegations which the board pleaded in support of this purported defense are: (1) At the time the lease was executed, "there was not a free and frank disclosure of all of the relevant information relative to the *** lease ***, such as the terms contained in Section VI of said lease"; (2) the alleged inadequacy of the consideration to be provided the county in exchange for the rental payments, "will shock one's conscience because

rent must be paid even though no building or insurance is provided"; (3) at the time the lease was executed the board "did not have competent and independent advice relative to the terms and conditions of the aforesaid lease"; (4) the rent which the PBC is to receive under the lease "comes from a direct general tax levy"; (5) the PBC "has duties involving a serious public interest as explained in *Ill. Rev. Stats.*, Chap. 85, Sec. 1032"; and (6) the PBC "has control over the subject matter of the lease, for a public interest, until all the rent has been paid, at which time the subject matter of the lease reverts to" the county.

Fiduciary relationship is a concept of quite broad applicability. In addition to relationships to which the concept is invariably applicable, such as attorney-client and agent-principal, the concept has also been held to encompass various other relationships in which trust is reposed on one side and there is a resulting influence and superiority on the other side. (*Davis v. Brickey* (1947), 397 Ill. 556, 74 N.E.2d 710.) In order to establish a fiduciary relationship, the trust and confidence allegedly reposed by the first party must actually be accepted by the second party. *People ex rel. Barrett v. Central Republic Trust Co.* (1939), 300 Ill. App. 297, 20 N.E.2d 999; see *Ware v. D.R.G., Inc.* (1974), 17 Ill. App. 3d 758, 307 N.E.2d 740.

Generally, where the parties to a purported fiduciary relationship deal with each other at arm's length, the party allegedly subject to influence is fully capable of attending to its business affairs, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged dependent party, no fiduciary relationship is deemed to exist. For instance, no such relationship exists between a purchaser of mortgages and the bank from which the mortgages are purchased where the purchaser receives the bank's advice as to the purchases, but is intelligent, is in good health, has freely available all of the information relative to the mortgaged properties, and there is nothing to prevent her from making an independent investigation as to the condition and value of the mortgaged properties. (*People ex rel. Barrett v. Central Republic Trust Co.* (1939), 300 Ill. App. 297, 20 N.E.2d 999.) A fiduciary relationship likewise does not exist between a bank and a customer obtaining a loan commitment from that bank despite the customer's having done business with the bank for several years and relying on one of its officers. *Wallace Nursing Home, Inc. v. Mercantile Mortgage Co.* (1968), 101 Ill. App. 2d 154, 242 N.E.2d 281 (abstract); see also *Guffey v. Washburn* (1943), 382 Ill. 376, 46 N.E.2d 971; *Cranwell v. Oglesby* (1937), 299 Mass. 148, 12 N.E.2d 81.

■■■ In the case at bar, the board's pleadings do not contain an explicit allegation that the PBC agreed to accept a fiduciary responsibility to see that the terms of the lease were fair to the county and comported to the county's expectations as to the contents of the lease. Although under certain circumstances the acceptance of fiduciary responsibilities may be implied from the facts pleaded, the board's pleadings do not support such an inference. To import acceptance of fiduciary responsibilities, something more than bare allegations that the party alleging that another is a fiduciary did not know what it was getting into when it executed the legal documents at issue, and that in signing the documents it made a bad bargain, is required. In *Southern Trust Co. v. Lucas* (8th Cir. 1917), 245 F. 286, 288, the court aptly stated the applicable legal principles and the rationale therefor:

> "[O]ne party cannot create a legal obligation or status by pleading ignorance and inexperience to an opposing party in a business transaction. Those who have in the law's view been strangers remain such, unless both consent by word or deed to an alteration of that status. The communicated desire or intention of one to impose upon the other a different status, involving greater obligations, is ineffective, unless the other consents to the changed relation. It is true that consent may find expression in acts as readily as in words. But such consent cannot be implied from a bare procedure with the transaction, after one party has declared his or her inexperience and reliance upon the other. The knowledge of this state of mind in a party may be an important consideration in determining the existence of fraud, as indicating what effect might be anticipated from statements made; but it cannot establish a confidential [fiduciary] legal status."

Stated somewhat differently:

> "Trust alone, \*\*\* is not sufficient [to imply acceptance of fiduciary responsibilities]. We trust most men with whom we deal. There must be something reciprocal in the relationship before the rule can be invoked. Before liability can be fastened upon one there must have been something in the course of dealings for which he was in part responsible that induced another to lean upon him, and from which it can be inferred that the ordinary right to contract had been surrendered. If this were not true a reputation for fair dealing would be a liability and an unsavory one an asset. A sale of bonds made by the Bank of England can be set aside no more quickly than a sale made by

a 'bucket-shop.' " (*Hancock v. Anderson* (1933), 160 Va. 225, 240-41, 168 S.E. 458, 463.

On the basis of the above authorities, it is readily apparent that the first three of the previously mentioned factual allegations contained in count II of the board's amended affirmative defenses are insufficient to support a holding that the PBC agreed to act in a fiduciary capacity *vis-a-vis* the board at the time that the terms of the lease were negotiated.

Nor do the board's three remaining principal factual allegations support its contention that it properly pleaded the existence of a fiduciary relationship. Many entities, both private and governmental, receive rental payments from various units of government, which payments are largely derived from tax revenues. Carried to its logical conclusion, the board's argument that the PBC's receipt of tax monies in payment of amounts due under the lease imposes a fiduciary duty upon the PBC would imply the existence of a fiduciary relationship between all entities which receive rental payments from governmental units and the units of government which make the respective rental payments. Such a result would be patently absurd. The same can be said with respect to the board's reliance on the PBC's having control of the new building for the term of the lease. If this fact in itself were deemed indicative of the existence of a fiduciary relationship between the county and the PBC, all lessors who retain responsibility for the maintenance and upkeep of the leased premises would logically stand in a fiduciary relationship to their lessees. Finally, section 2 of the Public Building Commission Act (Ill. Rev. Stat. 1981, ch. 85, par. 1032) merely sets forth the legislative findings which prompted the General Assembly to enact that legislation; it contains nothing which indicates a legislative intent that PBC's act in a fiduciary capacity when negotiating lease agreements with the governmental entities which created them.

Neither of the cases upon which the board relies in support of its contention that it properly alleged the existence of a fiduciary relationship supports that assertion. *City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559, 357 N.E.2d 452, stands for the proposition that a fiduciary relationship exists between governmental employees and officials and their governmental employers. An entity negotiating the terms of a lease agreement with a governmental unit obviously is not an employee of that governmental unit; in fact, unless and until a lease agreement is executed, such an entity occupies no legally cognizable relationship whatsoever with respect to the governmental unit.

In *Brickey*, the fiduciaries' acceptance of the trust and confidence reposed in them was implicit in their accepting the care and custody of an aged woman who was obviously incapable of caring for herself and managing her own affairs. The instant case, by contrast, involves two governmental units which were negotiating a lease agreement. The pleadings contain nothing which would indicate that the parties were not in a position to conduct the negotiations at arm's length or or that the board was subject to the domination and influence of the PBC. Although the board did allege that it lacked competent and independent advice with respect to the lease terms, it did not allege that at the time of the negotiations it was actually incapable of obtaining such advice.

In summary, all of the board's alleged affirmative defenses argued on appeal are, as a matter of law, insufficient to constitute a bar to the enforcement of its obligations under the lease, and the trial court therefore did not err in dismissing them. Since the board did not argue on appeal any reasons for the impropriety of the circuit court's final order other than the alleged affirmative defenses discussed in this opinion, all other matters alleged in the board's pleadings in opposition to the PBC's complaint for declaratory judgment have been waived for purposes of appeal. We therefore affirm the trial court's order declaring that the lease is valid and enforceable as written.

Affirmed.

GREEN and WEBBER, JJ., concur.