THE WORNER AGENCY, INC., Plaintiff-Appellee, v. MORRIS DOYLE *et al.*, d/b/a Doyle Construction Company, Defendants-Appellants.

Fourth District   No. 4—84—0739

Opinion filed June 10, 1985.

852

Tepper & Gwinn, P.C., of Urbana (John Gwinn, of counsel), for appellants.

Dobbins, Fraker, Tennant, Joy & Perlstein, of Champaign (D. Cameron Dobbins, of counsel), for appellee.

JUSTICE WEBBER delivered the opinion of the court:

Defendants appeal from an order of the circuit court of Champaign County which awarded a money judgment to the plaintiff. Although the basis for the judgment is disputed by the defendants, a fair assessment of the entire record leads to the conclusion that it was a finder's fee growing out of a construction contract obtained by defendants from a third party not involved in this litigation.

This case was before us on a previous occasion. (*The Worner Agency, Inc. v. Doyle* (1984), 121 Ill. App. 3d 219, 459 N.E.2d 633.) After remandment, a bench trial was held on the merits with the results just described. On appeal, defendants raise several issues which may be briefly cataloged as: (1) want of consideration for the agreement for a finder's fee, (2) breach of fiduciary duty by the plaintiff, (3) violation of the Real Estate License Act, and (4) failure of plaintiff to prove it was the procuring cause of the transaction.

A brief summary of the evidence adduced at trial is in order. Eldon Worner, president of plaintiff, was a close friend, advisor, and confidant of Mrs. Alberta Cattell, the president and principal shareholder of the Institute of Personality and Aptitude Testing (IPAT). IPAT was seeking new quarters and Cattell sought Worner's advice on the matter. Eventually a tract of land was purchased and a firm engaged to draw plans and specifications for a new building. Worner advised Cattell on both matters. Bids were then sought on the construction project and Worner suggested two firms. During a discussion of potential bidders, Dr. Sam Krug, IPAT's general manager, suggested defendants, of whom Worner had no personal knowledge. He investigated them, and based upon what he learned, recommended that they be allowed to bid. Three bids were received, one from each of the firms suggested by Worner and one from defendants, who were the successful bidder.

Prior to the bidding process Worner made arrangements for a meeting between himself and Krug and one of the defendants on November 19, 1980. A set of preliminary plans was delivered, and Morris Doyle signed a statement typed on Worner letterhead, which provided:

"If Doyle Construction Co. should receive the bid to build an office building for Mrs. Cattell or the I.P.A.T. organization, a 3% real estate commission will be paid The Worner Agency of Rantoul on the total cost of the building. If the land is purchased separately by the buyer, this cost would not be included in the cost of building.

The commission will be paid within 15 days of final settlement day, date of occupancy, or within one year of above date, whichever occurs first."

This document provides the centerpiece for this litigation as well as the prior proceedings here and in the trial court. Worner testified that the document represented a common form of transaction when a broker brought a customer to a builder and quoted Doyle as saying that he was accustomed to such a transaction, having done it many times. Both of the other bidders had similar arrangements with Worner. Worner stated that usually such arrangements were mere oral agreements—"If we bring them a buyer they pay a finder's fee."

It further appeared from Worner's cross-examination that he received a commission on the sale of the building lot to IPAT as well as a commission on the sale of the former IPAT premises. He reviewed all the bids on the new building and determined that the Doyles' was the lowest. He reiterated that the Doyle bid did not originate with him.

Krug, IPAT's general manager, corroborated much of Worner's testimony. He stated that during the entire construction, planning, and relocation of IPAT, Cattell relied heavily on Worner's advice. He understood throughout that Worner would be compensated; although uncertain as to the exact method, he believed that IPAT would ultimately bear the cost as part of the new construction. He corroborated the fact of the meeting with Morris Doyle and the conversation regarding the agreement as recounted by Worner. Prior to that meeting he had had no contact with the Doyle firm, it being Worner's function to initiate bids. On cross-examination Krug stated that one of Morris Doyle's sons had worked on his (Krug's) house and that the suggestion that defendants be allowed to bid came from him. He understood that Worner's role was complete when the bidding process was complete. Apparently Krug himself represented IPAT when extras and

credits were discussed during construction.

Morris and Grover Doyle, defendants, were called by the plaintiff Worner as adverse witnesses. Morris corroborated the events in the meeting of November 19, 1980, with Worner and Krug. He identified certain plaintiff's exhibits, one of which bore the legend "3% Real. Fee $5000." He stated that the "3%" was in Grover's handwriting but the rest was neither his nor Grover's. It "seemed" to him that he told Grover that Worner was "looking for a fee," but he could not be certain.

Grover Doyle also identified certain plaintiff's exhibits and corroborated Morris' testimony about the "3% Real. Fee $5000." Various exhibits contained different final cost figures for the project. On one of them it was shown as $169,454.98, and on that sheet appeared "chg. this on taxes-$5100-Realty?"

At another location on the same sheet appeared:

"$169,630.24

   5,100.

174,730."

He stated that the first note was "for tax purposes," and that the "final payment" statement showing the final cost of the job indicated $196,935.10, less a credit of $264.

Both Morris and Grover testified that they have not paid Worner a fee, that they have never told Worner that they were not going to pay a fee, and that they have never told Worner that they do not believe a fee is due under the agreement.

Worner was recalled as an adverse witness for the defendants, and, after reiteration of the events about the meeting of November 19, 1980, he was asked about prior commissions from builders. He testified:

"In real estate, with 10 salesmen in each office, many times we brought people looking for houses, and they don't see what they want in a used house, so they say what about new ones. Then we take them to a builder. And, in real estate, we seem to have a common understanding between builders and ourselves that, if we bring them a buyer—a finder's fee—we get paid, and we set the commission at that [sic] time we take them to the person. Other times they do have spec houses listed in our multiple listing book, and the fee is set and explained and all, but, on a spec house or a new house built for a builder, there—they are usually happy to have us bring them a customer.

Q. [By defense counsel] On a spec house?

A. No. On an individual house wanted by a customer or buyer on their draw—their idea of what they want built for them.

Q. You have, also, done that on spec houses, haven't you—had commissions on selling builders—

A. Oh, sure. Spec builders just give a general—if you sell our house we will pay you three percent, two percent, one percent, whatever."

Morris Doyle testified that there had been no relationship with Worner prior to the November 1980 meeting, nor with Krug nor Mrs. Cattell, and that he had no knowledge of the IPAT project until that meeting.

Grover Doyle testified that the contractor's final affidavit as to the cost of the IPAT job contained no provision for a fee. He dismissed the various indications on the exhibits (*i.e.*, $5100) as "tax doodling." He also stated that the Doyle company benefited from having the opportunity to bid on the job.

After hearing final arguments, the trial court several weeks later entered a short order from the bench finding in favor of the plaintiff and against the defendants in the sum of $5,900.13 with interest from October 30, 1981. The figure apparently represents 3% of the final cost of $196,935.10 minus $264.

Before proceeding to the other issues raised by the defendants, we first must comment briefly on a matter of legal taxonomy. Defendants claim that "finder's fee" is nowhere mentioned in the pleadings and that the case concerns a real estate commission, which is the language used in the agreement. Therefore, they argue, the law of real estate commissions must govern. We do not agree.

■ All of the evidence at trial supports the conclusion that the agreement was for a finder's fee, not for a real estate commission. The agreement itself is ambiguous in this regard. It first provides for a "real estate commission," but the balance of the language implies that the amount payable is a referral, or finder's, fee for new construction business. The latter is not a "real estate commission" in the usual sense of the term; *i.e.*, a commission on the sale or lease of real estate.

In *URS Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 427 N.E.2d 1295, the "four corners" approach to ambiguous documents was rejected. In the instant case, all of the parol evidence in the record, together with the trial court's implicit finding, demonstrates that a finder's fee was the subject matter of the dispute. There is no evidence in the record which would sustain a finding of a real estate commission.

■ Defendants' first principal contention is that the agreement is void for lack of consideration and mutuality of obligation. In support of the thesis, they argue that plaintiff provided no services for the construction of the building and that plaintiff lacked any obligation to work for the acceptance of defendants' bid.

Plaintiff has raised some procedural questions in reply to defendants' arguments. It first contends the lack of consideration is an affirmative defense and defendants did not carry their burden of proof. In our prior opinion in this case, we noted that lack of consideration, as opposed to failure of consideration, is not an affirmative defense. (*The Worner Agency, Inc. v. Doyle* (1984), 121 Ill. App. 3d 219, 222-23, 459 N.E.2d 633, 635.) It was plaintiff's burden to establish the existence of consideration.

As to mutuality, plaintiff argues that lack of mutuality is no defense as to wholly executed contracts and that complete performance may remedy lack of mutuality at the contract's inception. It also argues that defendants have waived the issue by failing to raise it in the trial court and that it was up to defendants to establish lack of mutuality as an affirmative defense. In our opinion, mutuality is only a specialized form of consideration. Defendants did raise the defense of lack of consideration at trial, and thus this issue has not been waived. Moreover, we noted in our initial decision in this litigation that want, as opposed to failure, of consideration is not an affirmative defense. (121 Ill. App. 3d 219, 222-23, 459 N.E.2d 633, 635.) Thus, the burden is on Worner to establish that the alleged contract was supported by adequate consideration.

■ The classic and time-honored definition of consideration is "anything which is of benefit to one of the parties to a contract or a detriment or disadvantage to the other." (12 Ill. L. & Prac. *Contracts* sec. 71 (1983).) Mutuality, in its most elemental sense, means that both parties to a contract must be bound by mutual obligations. (*Kraftco Corp. v. Koblus* (1971), 1 Ill. App. 3d 635, 274 N.E.2d 153.) Mutuality is a characteristic of contracts which are largely unperformed and executory in nature where no consideration has flowed to either party. In this situation, mutuality is a substitute for consideration. It follows that mutuality becomes a nonissue where consideration has otherwise been conferred upon one of the parties to the contract. (See *Armstrong Paint & Varnish Works v. Continental Can Co.* (1921), 301 Ill. 102, 133 N.E. 711.) In our opinion there was consideration here for the defendants' promise to pay a finder's fee, and thus the question of mutuality disappears from the case.

■ The general rule is that if the alleged consideration for the

promise has been conferred prior to the promise upon which alleged agreement is based, there is no valid contract. As with all general rules, there are exceptions. These are where (1) the consideration was rendered at the request of the promisor; (2) the alleged consideration was of a "beneficial" or "meritorious" nature which placed the promisor under a moral duty or obligation such that consideration for the promise will be implied; (3) the promise is to pay a "debt due in conscience," such as a promise to support an illegitimate child; or (4) the promise is founded upon an antecedent legal obligation, such as a debt which has become barred by the statute of limitations. (*Carson v. Clark* (1833), 2 Ill. 113, 114-15.) Not every benefit conferred upon an individual is deemed to create a moral duty to repay which forms consideration for a promise of the person benefited to pay for the benefit. For instance, no consideration is deemed to exist where a benefit is imposed against another's will, such as where its nature or the manner of conferring it is repugnant to the feelings and wishes of the party benefited. Rather, all circumstances must be of such a nature as to presuppose a request for the benefit. 2 Ill. 113, 116.

The question in the instant case is whether it falls within one of the exceptions. The record is clear that any consideration for the defendants' promise was performed before the signing of the agreement: Worner's informing the Doyles of the IPAT project, delivering preliminary plans for the building, and putting the Doyles in touch with IPAT officers. The record is also clear that Worner played no part subsequent to the November 1980 meeting.

Obviously, the case is not one of a "debt due in conscience" nor one founded upon an antecedent legal obligation. There is some basis for saying that the consideration was rendered at the request of the defendants, *i.e.*, Morris Doyle's agreeing to meet with IPAT officers. Performance may ameliorate an initial lack of consideration if the performance is clearly invited. Compare *Illinois Commerce Com. v. Central Illinois Public Service Co.* (1975), 25 Ill. App. 3d 79, 322 N.E.2d 520; *Air Conditioning Training Corp. v. Majer* (1944), 324 Ill. App. 387, 58 N.E.2d 294.

More apropos to the instant case is the exception of "beneficial" or "meritorious" consideration, imposing a moral obligation yielding an implied consideration. There are no Illinois cases which have addressed this principle in the context of a finder's fee. There are a handful from other jurisdictions.

In *Schaller v. Litton Industries, Inc.* (E.D. Wis. 1969), 307 F. Supp. 126, 131-32, the plaintiff identified a certain corporation as a possible merger candidate for the defendant corporation and informed

the defendant corporation of this fact. At the same time, the plaintiff told the defendant that he would expect a reasonable fee for his services in arranging the merger. At first, the defendant told the plaintiff that he would have to look to the merger candidate for his fee, but requested of the plaintiff basic information regarding the merger candidate. Negotiations were then begun, but they subsequently broke off. Later, however, the negotiations were reopened on the suggestion of a third party and a merger accomplished. The court held that these facts adequately established the existence of an implied contract between the parties for the payment of a finder's fee, since a sufficient relationship existed between the plaintiff's activities and the merger to entitle the plaintiff to such a fee.

In *Swingle v. Myerson* (1973), 19 Ariz. App. 607, 609, 509 P.2d 738, 740, the plaintiff advised the defendant of the availability for sale of a savings and loan association, and told the defendant at the time that he informed the defendant of the opportunity that he expected to be compensated for bringing the defendant and seller together if the sale were made. Following the defendant's purchase of the association, the court held that the defendant was entitled to recover a finder's fee on the basis of *quantum meruit*, despite the lack of an express contract between the parties.

In *Bellanca Corp. v. Bellanca* (1961), 53 Del. 378, 383-89, 169 A.2d 620, 623-26, the plaintiff attended the first meeting of persons who desired to effectuate a corporate merger, at which most of the confidential financial details were stated. The court held that this evidence was sufficient to support findings that the plaintiff arranged the meeting in the expectation of receiving payment, and that the corporate seller, through its directors, had accepted the benefit of his services in the knowledge that compensation would be expected therefor.

Finally, in *Kaiser v. Fadem* (Okla. 1955), 280 P.2d 728, 733, the plaintiff disclosed the existence of and showed a gasoline plant which was for sale to the defendant, who was interested in purchasing a gasoline plant. Subsequently, the defendant purchased the plant and agreed to compensate the plaintiff for his services. The court held that the plaintiff-finder was entitled to a fee under the agreement since the moral obligation of the purchaser created by the receipt of material benefit from the plaintiff was a sufficient substitute for the consideration which was otherwise lacking in the agreement.

We find the cases from our sister States persuasive. In the instant case the defendants admitted that they had benefited from the plaintiff's actions and that they would not have known about the IPAT job

if the plaintiff had not arranged the meeting of November 1980. There is sufficient evidence in the record that a benefit was conferred on the defendants, and this benefit is deemed adequate consideration for their promise to pay the finder's fee.

■ Defendants' second principal issue is that of breach of fiduciary duty. They maintain that Worner was in a fiduciary capacity as agent of Mrs. Cattell and IPAT and that by accepting a fee from an adverse party he would breach that duty.

Initially, we hold that this issue has been waived by the defendants. In our prior opinion in this case it was said (*The Worner Agency, Inc. v. Doyle* (1984), 121 Ill. App. 3d 219, 222, 459 N.E.2d 633, 635):

> "The test of whether a defense is affirmative and must be pleaded by a defendant is whether the defense gives color to the opposing party's claim and then asserts new matter by which the apparent right is defeated. The admission of the apparent right is inferable from the affirmative defense."

A defense that a contract is void because it resulted from breach of a fiduciary duty is clearly affirmative in nature because while admitting the *prima facie* validity of the contract, it asserts the new matter of the breach of a fiduciary duty to destroy the contract's validity.

Nowhere in Doyles' affirmative defense is it asserted that the November 19, 1980, agreement is the product of a breach of fiduciary duty. Moreover, Doyles' written closing argument submitted to the circuit court on August 29, 1982, contains no mention of a breach of fiduciary duty defense.

Points raised for the first time on appeal are considered waived. *J.R. Sinnott Carpentry, Inc. v. Phillips* (1982), 110 Ill. App. 3d 632, 443 N.E.2d 597.

■ Even if the matter of waiver were ignored, no different result would ensue by which the agreement for a finder's fee would become void. Although there was no express fiduciary relationship between Worner and Cattell and such a relationship is not to be lightly inferred (*De Witt County Public Building Com. v. County of De Witt* (1984), 128 Ill. App. 3d 11, 469 N.E.2d 689), there is some basis in the evidence for saying that it did exist, at least insofar as the selection of a bidder for the new IPAT building was concerned. Cattell sought out and relied on Worner's advice and followed that advice; however, Cattell herself has made no claim against Worner and in fact offered herself to pay the finder's fee if it were not forthcoming from Doyles. In effect, Cattell waived any purported breach of Worner's fiduciary obligation.

More importantly, if the Doyles' theory were upheld, it would put

an end to all finders' fees. The nature of such a fee raises an inherent conflict between an owner's interest in a low bid and a broker's interest in a higher fee, but Worner's testimony as to how finders' fees are handled is uncontradicted. It has been held that the peculiarities of a particular trade or type of business may make seemingly impregnable doctrines of law inapplicable. *De Witt County Public Building Com. v. County of De Witt* (1984), 128 Ill. App. 3d 11, 469 N.E.2d 689.

In the circumstances of this case, there would also appear an indication of unjust enrichment of the Doyles. As has been pointed out, the Doyles' worksheets contained entries which showed a disposition to include the finder's fee as part of their bid, notwithstanding Grover Doyle's testimony about "tax doodling." There is also Krug's testimony which indicated that IPAT expected that Worner would be paid a fee for his assistance in selecting a contractor. The Doyles apparently still retain the $5,100 which under the prevailing practices of the real estate and construction industry rightfully belongs to Worner.

In sum, the issue has been waived by the defendants and is without merit in any event.

■■ Defendants next contend that Worner was in violation of section 18(e)(5) of the Real Estate License Act of 1983 (Ill. Rev. Stat. 1983, ch. 111, par. 5818(e)(5)) which provides in substance that a broker or salesman may not act in a transaction for more than one party without the written acknowledgement of all parties to the transaction. The short answer is that the Act applies to "brokers" and "salesmen," not to "finders." There is a generic difference, as we have already held, between a finder's fee and a real estate commission. It follows that the same difference exists as between finders on the one hand and brokers and salesmen on the other hand. The contention is without merit.

■■ Finally, defendants contend that Worner was not the procuring cause of the transaction. Case law is clear that a finder must establish that his services were the "procuring cause." *Business Development Services, Inc. v. Field Container Corp.* (1981), 96 Ill. App. 3d 834, 422 N.E.2d 86; *Modern Tackle Co. v. Bradley Industries, Inc.* (1973), 11 Ill. App. 3d 502, 297 N.E.2d 688.

No hard and fast definition of "procuring cause" is feasible; it will depend on the circumstances of each case. Generally, in real estate law, a broker is the procuring cause of sale if he was instrumental in bringing the buyer and the seller together and if a sale was thereafter made as a result. (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 408 N.E.2d 1069.) Despite the differences in functions performed, the same general principles apply to finders.

In the instant case the defendants argue that it was Krug's suggestion which brought them into the picture; hence, Krug was the procuring cause and Worner was not. The theory ignores reality. Worner was in charge of clearing all bidders and held a veto power over them. It was his recommendation which resulted in Cattell's acceptance of the Doyles' bid and thus he was "instrumental" in bringing them together. (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 408 N.E.2d 1069.) Worner, under the circumstances here, was the procuring cause.

For all the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

McCULLOUGH and TRAPP, JJ., concur.